705 A.2d 82

**Kelly GRAHAM**

v.

**STATE of Maryland.**

**No. 491 Sept. Term., 1997.**

Court of Special Appeals of Maryland.

Feb. 2, 1998.

Cathell, J., filed a dissenting statement.

Arthur A. DeLano, Jr., Asst. Public Defender, Baltimore, for appellant.

Devy Patterson Russell, Asst. Atty. Gen., for appellee.

Before CATHELL*, DAVIS and SONNER, JJ.

DAVIS, Judge.

Appellant Kelly Graham was sentenced to a term of ten years imprisonment, with all but five and one-half years

---

* Cathell, J., participated in the hearing and decision of this case while an active member of this Court; this opinion was filed subsequent to his appointment to the Court of Appeals.

suspended and a probationary period following service of the unsuspended portion of the sentence upon his conviction by a jury in the Circuit Court for Washington County of possession of cocaine with intent to distribute. From the conviction and sentence, he presents for our review one issue:

Whether the lower court erred in denying his motion to suppress the drugs recovered from his person.

## PREFACE

Liberty comes not from officials by grace but from the Constitution by right.

These words were uttered by United States Supreme Court Justice Anthony M. Kennedy in his dissenting opinion in the recent case of *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). Justice Kennedy was referring to what he perceived to be the implications of the Court's decision in *Wilson* in conjunction with the Court's decision in *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Optimistically anticipating that "most officers ... will exercise their new power with discretion....," Justice Kennedy predicted what he considered would be the result of the *Wilson* decision.

The practical effect of our holding in *Whren*, of course, is to allow the police to stop vehicles in almost countless circumstances. When *Whren* is coupled with today's holding, the Court puts tens of millions of passengers at risk of arbitrary control by the police. If the command to exit were to become commonplace, the Constitution would be diminished in a most public way.

519 U.S. at ——, 117 S.Ct. at 890. In a separate dissenting opinion authored by Justice Stevens, citing the Annual Report of the Maryland Judiciary (1994–1995), the opinion observed that, "in Maryland alone, there are something on the order of one million traffic stops each year." *Id.* at ——, 117 S.Ct. at 888.

The majority opinion in *Wilson*, of course, held that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Id.* at ——, 117

S.Ct. at 886. Pertinent to our decision herein, the Court noted:

Maryland urges us to go further and hold that an officer may forcibly detain a passenger for the entire duration of the stop. But respondent was subjected to no detention based on the stopping of the car once he had left it; his arrest was based on probable cause to believe that he was guilty of possession of cocaine with intent to distribute. The question which Maryland wishes answered, therefore, is not presented by this case, and we express no opinion upon it.

*Id.* at —— n. 3, 117 S.Ct. at 886 n. 3. Thus, although the Supreme Court was presented with the question of what actions police officers making traffic stops may take vis-a-vis the passengers in the vehicle, it confined its holding to the narrow issue of whether such passengers could be ordered out of the vehicle. Significantly, the underlying basis for allowing officers conducting traffic stops to order the passengers out of the vehicle is for the protection and safety of the officers. *Id.* at ——, 117 S.Ct. at 887; *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). Absent facts that would indicate a threat to the safety of the officer, the only viable basis for a continued detention of a passenger beyond that period of time necessary to dispose of the traffic infraction must be justified by a reasonable suspicion that criminal activity is afoot. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983); *Berkemer v. McCarty,* 468 U.S. 420, 436–37, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984).

We are called upon in this appeal to decide whether, and for how long, police officers may detain a passenger once the stated purpose of a traffic stop has been effectuated. For the reasons set forth in the discussion which follows, we shall reverse the judgment of conviction.

## FACTS

On the evening of February 28, 1996, at approximately 9:10 p.m., Trooper First–Class Jeffrey L. Kissner, while on drug

interdiction patrol assigned to intercept drug couriers, observed the vehicle in which appellant was a passenger exceeding the posted speed limit on Route 81 in Washington County. He also observed that the light illuminating the vehicle's license plate was out. Consequently, Trooper Kissner stopped the vehicle.

Trooper Kissner had been working as a member of a two-car drug interdiction team, the other vehicle having been operated by K–9 Trooper First–Class Charles Stanford, who employed Dillon, a K–9 qualified and certified as a patrol/attack and narcotics canine. At the inception of the traffic stop, Trooper Stanford and the K–9 were involved in a stop at another location which resulted in at least a twenty minute delay in arriving at the location of appellant's traffic stop. Ordinarily, Trooper Stanford and the K–9 would have arrived within a few minutes.

The operator of the vehicle, Carey Lee Davis, when ordered to produce his driver's license and the vehicle's registration card, advised Trooper Kissner that he did not have a driver's license. Appellant thereupon produced a registration card and informed the officer that he was the owner of the car. Of the two forms of identification appellant displayed, neither was a driver's license.

In response to the trooper's inquiry, Trooper Kissner stated that one of the two occupants had said they were traveling from New Jersey whereas the other occupant told him they were coming from Pennsylvania. Both had indicated they were en route to Martinsburg, West Virginia. Trooper Kissner then radioed to Trooper Stanford requesting that the K–9 unit respond to his location.

After directing Davis, the operator of the vehicle, to sit in his police car, Trooper Kissner radioed the police barracks for verification that Davis had no driver's license. Sometime shortly after requesting information regarding the status of Davis's driving privileges, Trooper Kissner received information that the operator's driving privileges had been suspended.

The driver was then placed under arrest and appellant was ordered to remain in his vehicle.

As previously indicated, occasioned by his presence at another traffic stop, Trooper Stanford and the K–9, Dillon, arrived approximately twenty-five minutes after the initial stop. On command, the K–9 circled the vehicle in an effort to detect narcotics, during which Trooper Stanford gave the command "up search," directing the K–9 to the driver's side window which was open. Dillon raised up on his hind legs, put his head in the window of the vehicle, and "alerted" to the presence of narcotics by sitting, after withdrawing from the driver's side window.

Appellant was then told to exit the car and, when he did, he was ordered to remove his left hand which had been in his left coat pocket. Upon a second command to remove his hand, one of the troopers reached into appellant's pocket and found fifty vials of what appeared to be cocaine. The substance was later determined to be cocaine whereupon appellant was arrested.

## STANDARD OF REVIEW

In reviewing the denial of a motion to suppress under MARYLAND RULE 4–252, we look only to the record of the suppression hearing and do not consider the record of the trial. *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749 (1987) (quoting *Jackson v. State,* 52 Md.App. 327, 332 n. 5, 449 A.2d 438, *cert. denied,* 294 Md. 652 (1982)); *see also Gamble v. State,* 318 Md. 120, 125, 567 A.2d 95 (1989); *Herod v. State,* 311 Md. 288, 290, 534 A.2d 362 (1987). In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to determining the credibility of the witnesses and to weighing and determining first-level facts. *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that his findings are clearly erroneous. *Riddick v. State,* 319 Md. 180, 183, 571

A.2d 1239 (1990). As to the ultimate conclusion, however, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Riddick*, 319 Md. at 183, 571 A.2d 1239; *Perkins*, 83 Md.App. at 346, 574 A.2d 356.

## THE PRECISE ISSUE PRESENTED

■ We have identified the issue the Court declined to address in *Wilson*, 519 U.S. at —— n. 3, 117 S.Ct. at 886 n. 3, as whether "[a]n officer may forcibly detain a passenger for the entire duration of the stop." The case *sub judice*, in precise terms, poses the question, "Is it constitutionally permissible to detain passengers of a vehicle once the purpose of the traffic stop has been effectuated?" [1] Lest there be any doubt, appellant was no less detained against his will than the passenger in *Dennis v. State*, 345 Md. 649, 693 A.2d 1150 (1997) in which the passenger there "rather than heeding the police command to remain in the vehicle, ... walks away from the scene and subsequently resists police attempts at detention." *Id.* at 650, 693 A.2d 1150. To suggest, somehow, that one may simply alight from a vehicle and casually walk away once a State Trooper has ordered one to remain in the vehicle is sheer folly. As the Court said in *Royer*:

First, it is submitted that the entire encounter was consensual and hence [Respondent] was not being held against his will at all. We find this submission untenable. Asking for and examining [Respondent's] ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told [Re-

---

1. The question reserved in *Wilson* dealt only with the actions police officers are allowed to take regarding passengers for the duration of the traffic stop. Since the Court confined its review to whether the officers could order passengers out of the vehicle as a means of ensuring the officers' safety, the period of time during which police actions are directed at passengers was unimportant. Normally, such precautionary measures are taken at the onset of a traffic stop and thus the length of the detention is not relevant to what actions may be taken. The issue before us is whether the detention of the passenger should continue once the purpose of the stop is effectuated.

spondent] that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and *without indicating in any way that he was free to depart, [Respondent] was effectively seized for the purposes of the Fourth Amendment.* These circumstances surely amount to a show of official authority such that a "reasonable person would have believed that he was not free to leave."

*Royer,* 460 U.S. at 502, 103 S.Ct. at 1326 (emphasis added). It is simply wrong to suggest that a traveler feels free to walk away when he has been approached by individuals who have identified themselves as police officers and asked for, and received, his airline ticket and driver's license.

*Royer,* 460 U.S. at 511–12, 103 S.Ct. at 1331. In every sense, appellant was seized, as was the passenger in *Dennis v. State,* the minute that Trooper Kissner ordered that he remain in the vehicle. Speaking to the Fourth Amendment implications of detaining the occupant of a vehicle, the Court, in *Whren,* reiterated:

Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of this provision. An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances.

*Whren,* 517 U.S. at 809–10, 116 S.Ct. at 1772 (citations omitted). Ultimately,

[t]he test to be applied in determining whether a person has been "seized" within the meaning of the Fourth Amendment is whether in view of all the circumstances surrounding the incident a reasonable person would have believed he was not free to leave.

*State v. Lemmon,* 318 Md. 365, 375, 568 A.2d 48 (1990) (citing *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988)).

The fact that the case *sub judice* involves seizure of the person, rather than of the vehicle, is of paramount import

because the illicit drugs were recovered from appellant's pocket; hence, the discovery of the cocaine was directly attributable to the detention of appellant. Had the cocaine been recovered from the vehicle, the issue would have been whether the arresting officers would have been required, under the circumstances, to determine if appellant had a driver's license [2] and, if not, whether an inventory search of the vehicle would have been reasonable since it could not be removed until someone licensed and authorized to drive it was identified.[3]

Thus, we must decide in this appeal whether, in the absence of articulable suspicion, a detention of the passenger from the point in time of the seizure of his person, i.e., the order to remain in the car, to the alerting of the K–9, indicating the presence of drugs, comports with decisions construing reasonableness under the Fourth Amendment.

## THE FOURTH AMENDMENT ANALYSIS

■ We begin by noting that appellant was a passenger in the subject vehicle and not the operator. The significance therein is that, unlike Davis, the driver of the vehicle, neither

---

**2.** Although Trooper Kissner testified appellant produced two forms of work identification and the registration card, neither he nor Trooper Stanford were queried as to whether appellant was specifically asked if he had a valid driver's license.

**3.** Among the exceptions to the warrant requirement of the Fourth Amendment is a valid inventory of an impounded automobile. The theory is that "routine administrative caretaking functions" of the police which are bona fide and not a pretext to conduct an impermissible search for evidence, is a necessary procedure, not only for the protection of the owner of the vehicle, but also to protect the police from assertions of impropriety regarding the handling of the vehicle and personal property therein. In the case of a valid inventory, it should be consistent with reasonable, standardized police procedures compatible with the administrative function of law enforcement rather than the investigative function. *See Colorado v. Bertine,* 479 U.S. 367, 371, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman,* 428 U.S. 364, 367–68, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976); *United States v. Skillern,* 947 F.2d 1268, 1275 (5th Cir.1991), *cert. denied,* 503 U.S. 949, 112 S.Ct. 1509, 117 L.Ed.2d 646 (1992).

Trooper Kissner nor Trooper Stanford had any reason to believe appellant was engaged in any violation of the criminal or traffic laws until Dillon alerted to the presence of cocaine twenty-five minutes after the initial stop. As Justice Stevens observed in his dissent in *Wilson,* "the Constitution should not be read to permit law enforcement officers to order innocent passengers about simply because they have the misfortune to be seated in a car whose driver has committed a minor traffic offense." 519 U.S. at ——, 117 S.Ct. at 889.

The majority in *Wilson,* discussing their decision in *Mimms,* penned:

> We reversed, explaining that "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion,'" and that reasonableness "depends 'on a balance between the public interest and the individuals right to personal security free from arbitrary interference by law officers.'"

*Id.* at —— – ——, 117 S.Ct. at 884–85 (citations omitted).

The Court goes on in *Wilson* to observe that it noted that the State "freely conceded" that "there had been nothing unusual or suspicious to justify ordering Mimms out of the car, but that it was the officer's 'practice to order all drivers [stopped in traffic stops] out of their vehicles as a matter of course' as a 'precautionary measure' to protect the officer's safety. We thought it 'too plain for argument' that this justification—officer safety—was 'both legitimate and weighty.'" The Court concluded that it observed, in *Mimms,* that the danger to the officer of standing by the driver's door and in the path of oncoming traffic might also be appreciable.

Considering "the other side of the balance" [the intrusion into the driver's liberty occasioned by the officer's ordering him out of the car], the *Wilson* Court recounted that the *Mimms*'s decision imposed but a *"de minimis"* intrusion on the driver, since he was already validly stopped for a traffic infraction. The Supreme Court then noted that we had held that "this *per se* rule does not apply to Wilson because he was

a passenger, not the driver." 519 U.S. at ——, 117 S.Ct. at 885.

The touchstone of the Fourth Amendment analysis in *Wilson*—the officer's safety—as was the case in *Dennis*, was very aptly articulated by Chief Judge Robert M. Bell, speaking for the Court of Appeals in *Dennis*, 345 Md. at 653–54, 693 A.2d 1150:

> What we clearly concluded in the instant case is that there was no reason articulated or indicated as to why it was necessary to detain Dennis "for the officer's safety," and the detention could not be justified on any other basis. First, there was no probable cause to arrest Dennis. Second, although the officer might have had a reasonable suspicion adequate to make an investigative stop pursuant to *Terry v. Ohio*, the officer did not intend to question Dennis, and a *Terry* investigative stop was not the basis for Dennis's detention. Without some explanation, we were unable to determine why it was safer for the officer to detain Dennis rather than allow him to walk away from the scene. Our holding resulted from the officer's indication that he did not make an investigative stop and was not motivated by any suspicion that Dennis was involved in illegal activity. We recognized that the officer might have had a basis for a *Terry* stop, but noted that the officer's stop was made only because of his unexplained belief that detaining Dennis was safer for the officer than letting Dennis leave the scene. There was no intent to interrogate Dennis as might have been permitted by *Terry* and no indication why Dennis should be stopped for the officer's safety.

The thread running through federal and State cases discussing intrusions into personal liberties is that the decisions seek to preserve those liberties unless there is demonstrated a public interest concern that must override protections guaranteed by the Bill of Rights. The public interest concern, in the context of traffic stops, as explicated in *Mimms, Wilson, Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968), and *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), is the need to insure the

safety of police officers. In the instant case, in which there is articulated no concern by either Trooper Kissner or Trooper Stanford for his personal safety,[4] the continued detention of the passenger must be justified on some other basis.

## OTHER REASONS FOR DETENTION

■ In issuing its ruling, the trial court explained:

... However the stop of the motor vehicle of course was with probable cause. The arrest of the driver was with probable cause. The momentarial [sic] seizure of the vehicle as the result of the violations of the law by the driver surely is a reasonable expected result.

The twenty-five minutes that elapses between the call and the time that the officer arrives with the dog to begin the scan is a reasonable time under the circumstances.

The alerting by the dog gives the police officers probable cause to believe that there is contraband within the vehicle

---

**4.** The court concluded that Trooper Stanford was justified in ordering appellant out of the vehicle in order that he might conduct a search of the car. The court, however, specifically rejected the prosecutor's suggestion that the removal of the cocaine from appellant's pocket was necessary as a precaution to detect weapons and to otherwise ensure the safety of the officers; hence, although the predicate for ordering passengers out of the vehicle, under *Wilson*, i.e., the officer's safety, was not articulated at the suppression hearing, *Wilson* is not implicated in any event, since the constitutional challenge is not to the actions of the troopers in ordering appellant out of the vehicle. The following transpired at the hearing on the motion to suppress:

> [PROSECUTOR] And I submit that suddenly what may have started off as a sixty-four point seven mile per hour VASCAR suddenly turned into a *Terry* situation where *the officers had to be concerned about weapons*. And that the recovery from the jacket was nothing more than a *Terry* frisk.
> And I submit that if you go down the line from stop to delay, to probable cause, to K–9 scàn, to recovery, there's nothing wrong with this recovery of c.d.s.

. . .

> THE COURT: Well what you're going to say I'm sure is that there was nothing before the Court to show *articulative [sic] suspicion of fear of* ....
> [APPELLANT'S COUNSEL]: Yes.
> THE COURT: Of weapons on the defendant.
> [APPELLANT'S COUNSEL]: No testimony at all your Honor.

in some fashion whether it's in the vehicle or whether it is on an individual who is in the vehicle. It gives the officers probable cause to search that vehicle.

The court alludes to the twenty-five minutes which elapsed between the call and Trooper Stanford's arrival with Dillon, but fails to address the fact that the operator admitted that he had no valid driver's license when the vehicle was first stopped and Davis's admission was confirmed shortly thereafter when Trooper Kissner radioed the police barracks.

When asked why he suspected that there were drugs in the vehicle, Trooper Kissner explained that the driver had no form of identification on him and advised that he was en route from Pennsylvania whereas appellant stated that they were traveling from New Jersey. Trooper Kissner stated, "in my mind I had two different stories at the time."

In rejecting the basis for Trooper Kissner's suspicions, we said in *Whitehead*, 116 Md.App. at 504–05, 698 A.2d 1115:

> The use of the "conflicting" details of their visit in New Jersey is unavailing here to show probable cause to suspect possession of narcotics. There is nothing about not having their stories together, about just whom they visited, or about the day that they left Baltimore, that somehow yields an inference of possession of narcotics. Or, put another way, there is nothing about narcotics laws violators that police can recognize from an *inability to agree upon these details of their journey to New Jersey*. In asking the questions, Trooper Donovan was not making inquiry to further the enforcement of the 55 mile speed limit. He was looking for justification to intrude upon the privacy of the person whom he had detained. Our review of the "inconsistency"—the different dates that their trip began and whom they had gone to visit—does not support any inference that the occupants were in possession of narcotics or that the automobile that Whitehead was driving contained narcotics.
>
> There is nothing that Donovan observed that even remotely indicates an involvement in the transportation of drugs. He did not observe scales, bongs, glassine bags, or

instruments which may have a law abiding use, but about which an educated police officer could testify can also be consistent with drug dealing and, therefore, could give rise to a permissible inference that criminal narcotic activity is afoot. Law enforcement personnel do not have the discretion to select neutral human behavior as the justification for the formation of probable cause. Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment, Section 3.6(f) (2d ed.1987); *People v. Reynolds,* 94 Ill.2d 160, 68 Ill.Dec. 122, 445 N.E.2d 766 (1983); *Donaldson v. State,* 46 Md.App. 521, 534, 420 A.2d 281 (1980).

(Emphasis added.)

In a case in which the detention was based on a hunch, the detainee having been arrested on a previous occasion for charges related to cocaine and marijuana, citing *Snow v. State,* 84 Md.App. 243, 578 A.2d 816 (1990) (quoting *Berkemer,* 468 U.S. at 436–37, 104 S.Ct. at 3148), we said, "because the purpose of the initial stop had been satisfied, we concluded that the trooper detained Snow and his vehicle twice: once when he stopped Snow for speeding, and again when he continued to hold Snow after issuing a ticket. As in the present case, the total length of the stop was brief, and did not exceed normal duration for a traffic stop. *Id.* at 264, 268, 578 A.2d 816." *Munafo v. State,* 105 Md.App. 662, 671, 660 A.2d 1068 (1995). In contrasting the difference between what we characterized as a single detention permissible under the Fourth Amendment analysis and a continued detention constituting a separate stop, we said:

In *[In re] Montrail M.* [87 Md.App. 420, 589 A.2d 1318 (1991)], by contrast, we held that a single detention took place. In that case, a sheriff's deputy observed a station wagon parked outside a business in an isolated area early in the morning. There were three persons in the car. The deputy called for backup, knowing that the only other unit on duty at the time was a canine unit. The deputy spoke with the driver, and his suspicions were further aroused by the driver's explanation of what he was doing in that particular location at 3:30 a.m. The deputy obtained the

driver's license and registration and began to run a check. Before the check was completed, the canine unit arrived, and the deputy conducted a quick scan of the station wagon. After the dog indicated that drugs were present, the deputy searched the car and found both marijuana and crack cocaine.

Our analysis of the situation emphasized two points. First, the canine scan occurred *during* an otherwise valid stop, which was based on reasonable suspicion. At the time that the scan took place, *the deputy was still awaiting the results of the license and registration check. Second, we noted that the scan did not prolong the detention.* Because the scan was conducted in a public place and did not inconvenience the car's occupants, the scan itself did not constitute a search within the meaning of the Fourth Amendment.

*Id.* at 671–72, 660 A.2d 1068 (emphasis added; citations and footnote omitted).

We observed that the distinguishing fact in *Munafo* was that the deputy did not actually issue a citation or warning after receiving word that Munafo's license and rental agreement were valid, but rather waited for the second member of his team to arrive so that the vehicle could be subjected to a further inspection. We ultimately concluded that, "We find it more than slightly illogical to allow officers to circumvent *Snow* merely by waiting to issue a citation until after conducting a search of a detained vehicle." *Id.* at 672, 660 A.2d 1068. *Munafo,* it should be emphasized, involved a ten minute detention.

## THE LENGTH OF THE DETENTION

■ Although there is no bright line rule for determining when the duration of a detention is such that it violates constitutional standards of reasonableness,

The Supreme Court has ... said that the "brevity of invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so

minimally intrusive as to be justifiable on reasonable suspicion."

*Snow,* 84 Md.App. at 265, 578 A.2d 816 (citations omitted).

For the sake of clarity and focus, our discussion herein only tangentially addresses a traffic stop in which the officers conducting the stop are investigating an offense previously committed, since such cases often turn on an analysis of whether the officers possessed probable cause. (*Cf. United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), in which Court considered reasonableness of detention in reliance on another police department's "wanted flyer" which was issued on the basis of articulable facts supporting *reasonable suspicion*—rather than probable cause—that the person wanted had committed offense.) As we have indicated, *supra,* the Supreme Court in *Whren* acknowledged the constitutional implication of a temporary detention "even if only for a brief period." *Whren,* 517 U.S. at 809, 116 S.Ct. at 1772. A detention based on probable cause obviously may continue until the probable cause has dissipated or developed into confirmed facts indicating criminal activity. At the other end of the spectrum, a detention for any period of time beyond the effectuation of the purpose for a traffic stop based on a hunch cannot be justified.

As noted, in *Mimms,* the Supreme Court, in allowing the driver to be ordered out of the vehicle, alluded to a *"de minimis"* intrusion, since the driver was already validly stopped for a traffic infraction. The Court, in *Delaware v. Prouse,* 440 U.S. 648, 662–64, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979), while disapproving traffic stops absent articulable reasonable suspicion that a motorist was unlicensed or the vehicle unregistered, opined that

[t]his holding does not preclude the State of Delaware or other states from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic or roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that purpose alone have their travel and

privacy interfered with at the unbridled discretion of police officers.

While the *Prouse* Court was clearly concerned about the arbitrariness of the stops conducted by Delaware patrol officers, it suggested an alternative which would not involve the officer's discretion as to whom would be stopped. Indeed, since the *Prouse* decision in 1979, check point stops to determine if motorists are driving under the influence of alcohol have become commonplace and, where used, have for the most part become accepted. Aside from overcoming the objection of the police officers exercising unbridled discretion and acting arbitrarily as to whom they stop, an equally desirable feature of such stops is that the motorists are marshalled through in swift fashion with barely an interruption in travel except when preliminary interviews indicate possible intoxication. Typically, sufficient personnel are posted at these check points to conduct field tests once it has been preliminarily determined that a motorist is intoxicated. Additional officers facilitate a swift process since the initial interviewer may simply refer those suspected of being intoxicated to other members of the team.[5]

In engaging in the balancing between the public interest and the governmental invasion of the individual's liberty, a momentary inconvenience, such as that posed by a check point stop, much more easily passes constitutional muster than would a stop for a longer period of time, during which there is a greater governmental intrusion.

From a practical standpoint, one may be deprived of personal liberty at the very time when it is most inconvenient. As Justice Stevens observed in *Wilson,*

---

5. Had there been additional units on patrol in the case *sub judice*, another unit may well have responded in a timely fashion, obviating the need to prolong the detention of appellant. Of course, budgetary constraints may dictate the number of K–9 units available for interdiction detail. Constitutional protections, however, may not be relaxed by reason of such constraints; thus, that an officer is detained at another traffic stop does not relieve the police team of its obligation to conclude traffic stops with dispatch.

Most traffic stops involve otherwise law-abiding citizens who have committed minor traffic offenses. A strong interest in arriving at a destination—to deliver a patient to a hospital, to witness a kick-off, or to get to work on time—the law can explain a traffic violation without justifying it. In the aggregate, these stops amount to significant law enforcement activity.

*Wilson*, 519 U.S. at ——, 117 S.Ct. at 888.

Several federal cases have discussed the significance of the length of the detention in the context of Fourth Amendment reasonableness. In suppressing cocaine recovered from the bag of a suspect arriving at O'Hare Airport from the Miami–Fort Lauderdale area on the basis that he was arriving from a "source city" and refused to produce identification, the United States District Court for the Northern District of Illinois held that a twenty to twenty-five minute detention while awaiting the arrival of a drug-detection dog was unreasonable. *United States v. Giuliani*, 581 F.Supp. 212 (1984).

Where customs agents investigating a money-laundering scheme pursued and detained suspects after an attempt to deposit almost $20,000 in cash in a bank, the United States Court of Appeals for the Second Circuit reversed the United States District Court for the Eastern District of New York, holding that a forty minute detention after an initially lawful stop based on reasonable suspicion had ripened into a *"de facto"* arrest when the agents discovered that the luggage suspected of containing currency, in fact, contained nothing incriminating and restricting themselves to such search was "a means of investigation that was likely to confirm or dispel [the agents'] suspicions quickly." *United States v. Babwah and Maharaj*, 972 F.2d 30, 32 (2d Cir.1992). Of particular relevance to the case *sub judice*, in addition to the length of time involved, is the court's observation that, "because the unlawful detention occurred before Babwah consented to the search of his residence, evidence seized in that search was inadmissible *unless the connection between the unlawful detention and the discovery of the challenged evidence was so attenuated by Babwah's consent as to remove the taint."* As in *Babwah*, the

ineluctable conclusion in the instant case is that the detention of appellant beyond the time when the purpose of the stop was effectuated precipitated the discovery of the illegal drugs.

In a case which involved a detention for "a few minutes," the United States Court of Appeals for the Sixth Circuit affirmed the United States District Court for the Northern District of Ohio which had convicted the defendants for the constructive possession of drugs and related weapons offenses. *United States v. Critton, et al.,* 43 F.3d 1089 (6th Cir.1995). Noteworthy to our discussion herein is the court's observation that, in that case, the K–9 unit arrived just a few minutes after the traffic stop for driving 75 miles per hour in a 65 miles-per-hour zone, whereupon the trooper had observed a folding knife on the vehicle console and the driver had also informed him that he had a knife—an illegal knife/brass knuckles combination—in his pants pocket, as well as a crack pipe in his sock. In addition to focusing on the brevity of the detention prior to the arrival of the K–9 unit, the court also emphasized that the criminal activity for which there was an articulable reasonable suspicion involved, unlike the case at bar, all of the occupants in the vehicle.

In *United States v. Haskins and Phillips,* 773 F.Supp. 965 (E.D.Tex.1991), the United States District Court for the Eastern District of Texas determined that a seven minute detention prior to the execution of a consent search form was reasonable in a case in which a pack of "Zig Zag" brand cigarette rolling papers had fallen out of the driver's purse when she was producing her driver's license. While the District Court noted the anxiety of the defendants, the inconsistency between the stories of the passenger and the driver and the extreme anxiety of the passenger, it was the court's determination that a seven-minute detention under the circumstances was brief and therefore comported with the reasonableness requirement of a Fourth Amendment intrusion.

Emphasizing the non-intrusiveness and brevity of the investigatory stop under consideration, the United States District Court for the Northern District of Illinois upheld the convic-

tion for possession of a controlled dangerous substance with intent to deliver in a case in which drug enforcement agents conducted a five-minute interview of a passenger en route from Florida, during which interview the passenger gave permission to search his bag. *United States ex rel. Bostick v. Peters,* 843 F.Supp. 1240 (N.D.Ill.1994). There, the court ultimately determined that no seizure of the person within the meaning of the Fourth Amendment ever occurred because the interview was, in fact, consensual and the corresponding detention of the luggage to allow the drug-detection dog to scan it for the presence of drugs was brief. Alternatively, the court held that petitioner had abandoned his luggage, thereby obviating any consideration as to the reasonableness of the "manner or time of this detention."

In a case in which the traffic officer had stopped a vehicle which he had observed make a "rolling stop" and a large amount of cocaine, a firearm, and a box of ammunition had been recovered as a result of a search purportedly based on the defendant's consent, the United States District Court for the Eastern District of Texas held that the consent was invalid and that there had been no probable cause for the search, nor was the intrusion a valid inventory search. *United States v. Doe,* 801 F.Supp. 1562 (E.D.Tex.1992). In so holding, the court opined:

> As the Supreme Court and lower courts have often articulated, the time limitations of a *Terry* stop depend on the facts of a given situation, including the level of an officer's suspicions and the actions of both the officer and suspects. They are not subject to a bright line time-limit [sic]. *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). . . .
>
> A traffic stop cannot become a convenient occasion for an officer to delay the travels of an ordinary motorist so that the officer may dispel a mere hunch that the motorist has committed a past crime or present crime. *See United States v. Walker,* 941 F.2d 1086, 1088–90 (10th Cir.1991) (order denying rehearing) (government interest in interdicting narcotics does not allow for delaying motorist for ques-

tioning where no reasonable articulable suspicion of drug-trafficking [sic] exists), *cert. denied,* 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992).

*Id.* at 1579. `United States v. Restrepo,* 890 F.Supp. 180, 195 (E.D.N.Y.1995), a case in which "a swarthy Hispanic-appearing male" driving a Cadillac with California license plates was stopped for driving 65 miles per hour in a 55 miles-per-hour zone, the court granted the motion to suppress evidence recovered which was the product of continued detention which led to, in turn, the consent to search. Defendant's consent had been obtained after officers observed what they believed was an unusually heavy vehicle door and alleged discrepancies in the responses by the occupants as to the length and purpose of the trip. The court said:

> The stopping officer stalled in issuing the warning to assure that the Guevaras would still be present when a back-up officer arrived. His hope was to elicit incriminating statements *which would justify a further detention and a search. Unnecessarily prolonging a traffic stop for the purpose of eliciting information about a suspected unconnected violation for which there is no objective basis is not acceptable.*
>
> . . .
>
> In addition, the second *officer pulled up after the detention had already exceeded its appropriate scope.*

The Sixth Circuit Court of Appeals had it exactly right when it declared:

> To condone the actions of the police in this case would unnecessarily extend the permissible boundaries of investigative detentions. More ominously, such a decision would relay the message that *any routine traffic stop can, even without probable cause of a further violation, be followed by an inherently coercive request to conduct a search of the detained vehicle.*

*Id.* at 195 (emphasis added).

The Supreme Court, in addressing the reasonableness of a twenty-minute detention of an individual suspected of criminal

activity, reversed the Fourth Circuit Court of Appeals, *Sharpe v. United States,* 660 F.2d 967 (1981), and upheld the petitioners' convictions for possession of a controlled substance with intent to distribute. *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). A Drug Enforcement Administration (DEA) agent had observed a blue pick-up truck with attached camper shell traveling in tandem with a blue Pontiac Bonneville, whereupon the agent followed the two vehicles for twenty miles as they proceeded into South Carolina where he radioed assistance from the state highway patrol in order to make an investigative stop of the two vehicles. The Pontiac, driven by petitioner, moved into the right lane at which time the pick-up truck "cut between" the Pontiac and the vehicle operated by the highway patrol officer and proceeded down the highway.

Petitioner, on demand, produced a Georgia driver's license and, after being unable to make radio contact with the highway patrol officer who was in pursuit of the camper, the DEA agent proceeded to the location where the highway patrol officer had pulled the camper over fifteen minutes after the truck had been stopped. The agent sought permission to search the camper, but, after the permission was not forthcoming, the agent confirmed his suspicions that the camper was probably overloaded by stepping on the rear of the truck and observing that it did not sink any lower. According to the agent, he could smell marijuana when he put his nose against the rear window which had been covered from the inside. Without attempting to obtain the permission of the driver of the camper, the agent removed the keys and opened the rear of the camper, observing a large number of burlap-wrapped bales resembling bales of marijuana. Approximately thirty to forty minutes after the stop of the petitioners' Pontiac, the agent returned to arrest the driver of the Pontiac.

In upholding the convictions of the two drivers, the Supreme Court said:

In assessing whether a detention is too long in duration to be justified as an investigative stop, *we consider it appropriate to examine whether the police diligently pursued a*

*means of investigation that was likely to confirm or dispel their suspicions quickly,* during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether *the police are acting in a swiftly developing* situation, and in such cases the court should not indulge in unrealistic second-guessing.

*Id.* at 686, 105 S.Ct. at 1575 (emphasis added).

The Court continued:

Respondents presented no evidence that the officers were dilatory in their investigation. The delay in this case was attributable almost entirely to the evasive actions of Savage, who sought to elude the police as Sharpe moved his Pontiac to the side of the road. Except for Savage's maneuvers, *only a short and certainly permissible pre-arrest detention would likely have taken place.* The somewhat longer detention was simply the result of a "graduate[d] ... response[e] to the demands of [the] particular situation[.]"

We reject the contention that a 20–minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains.

*Id.* at 687–88, 105 S.Ct. at 1576 (emphasis added; footnote and citation omitted).

*Sharpe* is illustrative of the Court's rationale that, although there is no bright-line time limitation in determining the reasonableness of a detention, it is the level of suspicion in conjunction with the actions of the police as well as the suspect which must be considered. In reviewing the length of time in *Sharpe*, the Court explicitly recognized the requirement that the police act diligently in confirming or dispelling their suspicions of criminal activity and, when the suspect, himself, is partially or wholly responsible for the delay, that should be factored into a determination of reasonableness.

While it goes without saying that a longer detention is more likely to run afoul of the Fourth Amendment, any governmental intrusion should be minimal and the least restrictive as the circumstances permit. Most important, the detention should

end once the purpose of the stop has been accomplished. Speaking directly to this issue in *Royer*, the Court said:

The Amendment's protection is not diluted in those situations where it has been determined that legitimate law enforcement interests justify a warrantless search: the search must be limited in scope to that which is justified by the particular purposes served by the exception.... The reasonableness requirement of the Fourth Amendment requires no less when the police action is a seizure permitted on less than probable cause because of legitimate law enforcement interests. The scope of the detention must be carefully tailored to its underlying justification.

The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: *an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.* Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's *suspicion in a short period of time.* It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

*Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26 (emphasis added; citations omitted). Thus, the length of the detention and the corresponding intrusion should be commensurate with the purposes of the stop and the detention should conclude once those purposes have been effectuated.

From the above, all of the authorities cited hold that a brief detention resulting in only minimal governmental intrusion will survive scrutiny with greater ease than an extended detention. In cases where the detention is for a longer period of time, there must be a reasonable articulable suspicion to continue that detention once the purported purpose for a

traffic stop has been effectuated. Factored into the equation are the actions of the police as well as the suspects, a longer detention being reasonable when it is occasioned in whole or in part by the suspect. When, on the other hand, there is evidence that the investigating officers have not proceeded as diligently as they could under the circumstances, a prolonged detention will be viewed as unreasonable. In the case presently before us, the prolongation of a detention because the K–9 unit is detained elsewhere must be viewed as contrary to the diligence required under a Fourth Amendment reasonableness analysis.

### THE INSTANT CASE

█ It is undisputed that Trooper Stanford normally responded with his K–9 "within a few minutes" upon being radioed that his partner was engaged in a traffic stop. It is further undisputed that, when initially accosted, the driver, Davis, admitted he did not have a valid driver's license and that fact was confirmed shortly thereafter when Trooper Kissner radioed the barracks. Trooper Kissner indicated that approximately twenty minutes of the twenty-five minute detention of appellant was attributable to Trooper Stanford being otherwise engaged in another traffic stop.

As discussed, *supra*, appellant was seized at the point in time when Trooper Kissner ordered him to remain in the car. That seizure of his person continued without any perceptible indicia of violation of any laws until the arrival of Dillon who alerted for the presence of drugs. The driver was arrested upon confirmation via the radio broadcast to the barracks that he did not have a valid driver's license. At the point in time when Davis was arrested, the purpose of the traffic stop had been effectuated. In other words, approximately five minutes, more or less, after the initial stop, Trooper Kissner had concluded his official duties with respect to the traffic stop and he was obliged to take Davis into custody and make arrangements for the removal of appellant's vehicle from the roadway or inquire as to whether appellant had a driver's license and could himself remove the vehicle from the roadway or proceed

in any manner that he ordinarily would have proceeded had he not been awaiting the arrival of Trooper Stanford twenty minutes later.

As we previously have observed, allowing the K-9 to scan the vehicle for drugs at a point in time when the trooper "was still awaiting the results of the license [and registration] check" in such a fashion "that the scan did not prolong the detention" would have been constitutionally permissible. *Munafo*, 105 Md.App. at 671–72, 660 A.2d 1068. Because there was no reasonable articulable suspicion that appellant had violated any laws whatsoever, Trooper Kissner could not, legitimately, continue to detain appellant for purposes of the K-9 scan once the driver was arrested and the purpose of the stop was thereby effectuated.

Supreme Court Justice Blackmun, in his dissenting opinion in *Royer*, described the challenge to law enforcement posed by purveyors of illegal drugs:

> Justice Powell, concurring in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), observed:
>
>> "The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs ... may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement."

460 U.S. at 513, 103 S.Ct. at 1332.

The special need for flexibility in uncovering illicit drug couriers is hardly debatable. Surely the problem is as serious, and as intractable, as the problem of illegal immigration discussed in *United States v. Brignoni–Ponce*, 422 U.S. [873] 878–879, 95 S.Ct. [2574] 2578–2579 [45 L.Ed.2d

607 (1975)], and in *United States v. Martinez–Fuerte*, 428 U.S. [543] 552, 96 S.Ct. [3074] 3080 [49 L.Ed.2d 1116 (1976)]. 460 U.S. at 513, 103 S.Ct. at 1335–36.

We certainly agree with the sentiments expressed in the cited excerpts and we applaud the efforts of law enforcement personnel to eradicate what has become a scourge threatening the very fabric of society, particularly as it effects the youngest among us. Had Trooper Kissner been clairvoyant and known from the very outset or had circumstances arisen during the stop which provided a reasonable articulable suspicion that Kelly Graham possessed fifty vials of cocaine, we would not be troubled by the trooper's eventual discovery of the illicit drugs. Until Dillon alerted for the presence of drugs, the information available to Trooper Kissner indicated appellant was guilty of nothing and was in no different position from any other passenger in a vehicle whose operator may have committed a minor traffic violation.

While we share Justice Kennedy's optimistic hope that "most officers ... will exercise their new power with discretion" and while we applaud their efforts in attempting to combat crime in general, and trafficking in narcotics specifically, the sweeping approach to law enforcement by a few make it necessary that courts set constitutional guidelines. Judge Rosalyn Bell, in *Snow*, 84 Md.App. at 268, 578 A.2d 816, concludes that opinion by setting forth and commenting on a colloquy between the court and defense counsel:

> THE COURT: Well I, I've already said that the detention was very limited in this case. It was bang, bang, within moments from the time the officer told him to go into the grass until the officer alerted, [sic] until the dog alerted. The officer certainly had a right to detain him up to that point....
>
> . . .
>
> [DEFENSE COUNSEL]: Judge, just for the record, this is the weakest, weakest probable cause I think I've ever seen. Just like the one we had before where [Officer]

Paros said, *"Yes, any person in Cecil County went and said he had to go to the bathroom with a station 3 miles behind and had tinted windows, that's enough for me to lock him up."* And that's what the citizens of Cecil County face, Judge.

THE COURT: They carry drugs, they've got to.

[DEFENSE COUNSEL]: I'm talking about those that don't carry drugs.

THE COURT: The ones that don't carry drugs, they shouldn't be subjected to anything. All right.

We think these words and the potential for abuse speak for themselves.

We concur with the last statement made by the trial judge in the cited quote, i.e., "The ones that *don't* carry drugs, they shouldn't be subjected to anything."

**JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY WASHINGTON COUNTY.**

CATHELL, Judge, dissenting.

I must respectfully dissent.