746 A.2d 422

Troy William REYNOLDS

v.

STATE of Maryland.

No. 343, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Dec. 9, 1999.

308

Samuel Hamilton, Silver Spring, for appellant.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Frank Weathersbee, State's Atty. for Anne Arundel County, Annapolis, on the brief), for appellee.

Argued before DAVIS, THIEME and KENNEY, JJ.

DAVIS, Judge.

On January 28, 1999, appellant Troy William Reynolds was convicted at a bench trial in the Circuit Court for Anne Arundel County for possession with intent to distribute a controlled dangerous substance (Count One) and possession of a controlled dangerous substance (Count Two). On March 24, 1998, appellant was arrested by Anne Arundel County Police, pursuant to two outstanding warrants in appellant's name in Prince George's County. Subsequent to the arrest, appellant

was searched, whereupon nineteen baggies of what was suspected to be cocaine were discovered in his pants pocket. Appellant was subsequently charged on June 6, 1998 by criminal information with the above offenses. On August 13, 1998, appellant filed a motion to suppress the evidence seized based on an illegal stop. A hearing was conducted on December 21, 1998 and the motion was denied. On January 28, 1999, appellant requested a reconsideration of the motion to suppress, which was denied, and a bench trial proceeded on a not guilty statement of facts. Appellant was convicted and the court merged Count Two into Count One. Subsequently, he was sentenced on March 23, 1999 to five years in prison with credit for four days served, with the remainder of the sentence suspended, and four years supervised probation.

On this appeal, we are presented with one question, which we rephrase as follows:

Did the trial court err when it denied appellant's motion to suppress evidence based on his Fourth Amendment protections against unlawful search and seizure?

We answer the question in the affirmative and, accordingly, reverse the trial court's denial of the motion to suppress.

## FACTUAL BACKGROUND

This appeal focuses on the events leading to appellant's arrest on March 24, 1998 on Meade Circle Road in the Meade Village neighborhood in Anne Arundel County. Appellant asserts that his initial detention by police that day was an unlawful seizure and violated his protections against unlawful search and seizure under the Fourth Amendment of the U.S. Constitution. At approximately 3:30 p.m., two uniformed officers—Detective Thomas Coleman and Officer McNamara—entered Meade Circle Road in Meade Village in Severn, Maryland, in their marked patrol vehicle. The officers observed a group of approximately ten individuals gathered on one of the street corners. One of the individuals yelled "five-

0" [1] and the group immediately began to disperse. Appellant continued to walk at a normal pace and the police pulled their vehicle along the sidewalk on which appellant was walking, exited the car, and approached him. Maurice Wilson, a friend of appellant and a witness at the suppression hearing, was initially walking along with appellant but, once the police stopped their vehicle, he continued in a different direction while still remaining in the area. The officers asked appellant his name and his date of birth to which he truthfully replied. Although what occurred next is disputed by the officers and witnesses who testified for appellant regarding how long appellant was detained and at what point he was handcuffed, we consider, upon our review of the denial of the motion to suppress, only that version of the testimony in the light most favorable to the State and accepted by the motions judge.

That version, as presented through the testimony of Detective Coleman, was that, after appellant stated his name and date of birth in response to the questions asked, the officers proceeded to radio in the information to check if any outstanding warrants existed in appellant's name. Detective Coleman testified at the suppression hearing that it was only after they received information that there were warrants outstanding against appellant from Prince George's County that he was handcuffed.

Subsequent to his arrest on the warrants, the police conducted a search of appellant and recovered two baggies, both of which contained other baggies, four in one bag, and fifteen in the other, of what was later to be identified as crack cocaine. Appellant was charged and eventually convicted of possession with intent to distribute a controlled dangerous substance and possession of a controlled dangerous substance. He was sentenced to five years in prison, all of which was suspended except for four days served that were credited, and four years of supervised probation. Appellant then filed this timely appeal.

---

**1.** According to testimony by appellant's witness, Maurice Wilson, "five-0" indicates that the police are coming now.

**312**

## DISCUSSION

### Introduction

 Reduced to its simplest terms, the issues in this case require us to answer two questions: 1) Was the initial encounter between Troy William Reynolds and the two law enforcement officers, Detective Thomas Coleman and Officer McNamara, a consensual accosting or a stop unsupported by reasonable articulable suspicion? 2) During the five minute detention of appellant, do the circumstances, when subjected to an objective standard, indicate that a reasonable person would have felt free to leave and end the encounter? *See Ferris v. State*, 355 Md. 356, 367, 735 A.2d 491 (1999). As court decisions—particularly decisions emanating from the Supreme Court—have considered Fourth Amendment implications attendant to police-citizen confrontations in public places, the thread running throughout these decisions is that lawfulness of the encounter turns on the reasonableness of the actions of law enforcement officials, which must be evaluated according to the alternative which is minimally invasive of personal liberties, yet permits officers to carry out their sworn duties when the facts, which have come to their attention through legitimate means, demonstrate the commission of a criminal act or acts. The Fourth Amendment is not implicated, however, when a citizen, in the absence of a show of coercive authority, consents to answer questions put to him or her by police officers.

Because of the manner in which appellant and the State have framed the issues on this appeal, we believe our discussion, *infra*, will more graphically demonstrate what constitutes an accosting and its constitutionally permissible scope when contrasted with more intrusive police actions. Recent decisions pronouncing the constitutionally sanctioned bases for an on-the-street stop have severely limited the right of law enforcement officials to engage in arbitrary stops except when the intrusion is minimal; random stops focusing on a particular suspect as the criminal agent of some as yet undiscovered crime continue to be disfavored.

## STANDARD OF REVIEW

■■■■ In reviewing the denial of a motion to suppress under Maryland Rule 4–252, we look only to the record of the suppression hearing and do not consider the record of the trial (or proceeding adjudicating the merits, i.e., agreed statement of facts). *Graham v. State*, 119 Md.App. 444, 705 A.2d 82 (1998) (quoting *Trusty v. State*, 308 Md. 658, 521 A.2d 749 (1987)); *see also Gamble v. State*, 318 Md. 120, 125, 567 A.2d 95 (1989); *Herod v. State*, 311 Md. 288, 290, 534 A.2d 362 (1987); *Jackson v. State*, 52 Md.App. 327, 332 n. 5, 449 A.2d 438, *cert. denied*, 294 Md. 652 (1982). In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to determining the credibility of the witnesses and to weighing and determining first-level facts. *Perkins v. State*, 83 Md.App. 341, 346, 574 A.2d 356 (1990). When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that his or her findings are clearly erroneous. *Graham*, 119 Md.App. at 449, 705 A.2d 82 (citing *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990)). As to the ultimate conclusion, however, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Lawson v. State*, 120 Md.App. 610, 614, 707 A.2d 947 (1998); *Graham*, 119 Md.App. at 450, 705 A.2d 82 (citing *Riddick*, 319 Md. at 183, 571 A.2d 1239; *Perkins*, 83 Md.App. at 346, 574 A.2d 356). In determining whether a seizure of the person took place, we look to the totality of the circumstances of the initial encounter between appellant and the police. *Ferris*, 355 Md. at 376, 735 A.2d 491. We review the trial court's factual findings in the light most favorable to the State, and review these findings for clear error, but we review the legal conclusions *de novo*. *Id.* at 368, 735 A.2d 491.

## THE ISSUES AS FRAMED BY
## APPELLANT AND STATE

Relying on our decision in *Lawson v. State*, 120 Md.App. 610, 707 A.2d 947 (1998), for the proposition that the initial

detention in the case at hand constituted a seizure of the person rather than an accosting, appellant asserts that "the discovery of facts subsequent to the stop cannot overcome the illegality of a stop that commenced without sufficient probable cause to justify the stop and subsequent detention." *Id.* at 618, 707 A.2d 947 (citing *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

In responding to the State's argument that the encounter between the police and appellant was consensual, Reynolds is constrained to engage in an analysis that distinguishes between a voluntary interaction and what constitutes a seizure of the person. Such an analysis necessarily involves a discussion of controlling authorities that consider Fourth Amendment implications of *"Terry* stop" cases, including recent decisions in which the Court of Appeals and this Court have articulated the "second stop" principle. Appellant's argument need not extend beyond a discussion of the circumstances under which a consensual encounter is transformed into a constitutionally impermissible seizure in view of the State's candidness in acknowledging that the encounter did not support a *Terry* stop. In other words, the State's concession that no basis exists to justify a *Terry* stop and our concurrence, upon our independent constitutional appraisal, in the legal efficacy of that concession relieves appellant of the task of responding to or countering any argument that there was any legal basis for the detention of appellant other than that it was consensual.

Indeed, the State offered no evidence at the suppression hearing or at argument before us that the stop in this case was a *Terry* stop. Detective Coleman recounted his reason for stopping appellant and the circumstances attendant thereto:

> [DETECTIVE COLEMAN]: We pulled near 1813—Circle when we saw [appellant], who wasn't familiar to me. I've worked that area for seven years, and I wasn't familiar with him. So we got out. We pulled over, and Officer McNamara and myself walked over to him on the sidewalk and asked him what his name was and, you know,

who he was here [to] see. Kind of just general information.

* * *

[APPELLANT'S COUNSEL]: Now, what, if anything, was he doing at that time for you to stop him?

[DETECTIVE COLEMAN]: Like I said, I wasn't familiar [with] who he was. I worked that area the whole time. Wasn't familiar, he walked away from the crowd. So we just pulled over and asked him, you know, who he was, what he was doing here, where he was from. That kind of—just basic information.

[APPELLANT'S COUNSEL]: Just basic information. But there was no reason for you to do that, was there?

[DETECTIVE COLEMAN]: It's my job.

[APPELLANT'S COUNSEL]: Except you just hadn't seen him before, is that right? I mean, you didn't know [who] he was?

[DETECTIVE COLEMAN]: Correct.

* * *

[APPELLANT'S COUNSEL]: What, if anything, was [appellant] doing when you first came in contact with that crowd and him, who was in the crowd? What, if anything, was he doing that would cause you to stop him?

[DETECTIVE COLEMAN]: It was just the fact that I didn't—they were standing on the corner. *I didn't know him. I wasn't familar* [sic] *with him. I knew unless he was someone new that had moved in the area, I didn't know who he was.*

Neither in the above excerpt nor anywhere else in his testimony did Detective Coleman express any fear for his safety or articulate facts that would constitute reasonable articulable suspicion that criminal activity was afoot.

The court, upon its review of the evidence at the suppression hearing, concluded:

[Appellant] says he was put against the fence. He [sic] witness said they just told him, "Go stand over there." And

that is a significant difference. It is also different in terms of the description of what was said about Tony Harold passed between the witnesses.

So I find from that conflict in their testimony and the rest of the circumstances it appears it was a reasonable accosting, it was not an arrest, not a detention. And that the police acted reasonable [sic] to arrest [appellant] only when they received confirmation over the radio that there was that warrant [sic] out for him.

Citing *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the State asserts, in its brief, "In this case, the encounter did not implicate the Fourth Amendment" because a seizure of the person only occurs when "an officer, by means of physical force or show of authority, restrains the liberty of a citizen."

At oral argument before us, the State was questioned with great vigor about its position, vis-a-vis appellant's asserted fruit of the poisonous tree taint on the seizure of the illegal contraband should we conclude that the initial stop was illegal. The State was specifically asked by the Court, "Can an illegal stop ripen into a legal arrest which will support seizure of the baggies of cocaine if probable cause is developed during an illegal detention?" The State maintained that the initial confrontation in this case was consensual and constituted nothing more than an accosting, which lasted until the officers received information regarding the outstanding warrants,[2] at which time they had probable cause to effect an arrest. The corollary was that the State acknowledged, in argument before us, that, if the initial encounter was an illegal stop unsupported by articulable suspicion, the warrants would not have been discovered and the probable cause upon which the arrest was based would not have been developed, nor the contraband recovered. In support of its position that the stop was an

---

2. Of course, a determination that the stop and detention was illegal would in no way vitiate the outstanding bench warrants and appellant is subject to the legal consequences attendant thereto just as if the stop had been legal.

accosting, the State points to the testimony of Detective Coleman that the encounter with appellant prior to the discovery of the outstanding warrants lasted only five—possibly ten minutes. The State also relies on Detective Coleman's testimony that appellant was not handcuffed until *after* the information was received regarding the outstanding warrants. The following excerpt more precisely represents what Detective Coleman said about the time lapse:

> [DETECTIVE COLEMAN]: I don't recall the specific time on this incident. *They have 20 minutes to respond.* Once they tell us initially, our—when our teletype operator, our dispatcher tells us that there is an outstanding warrant in the computer, then Prince George[']s County has 20 minutes to respond back and tell us yeah or nay. They want it or they don't want it, it's a good warrant or it's not a good warrant. But I don't recall the specific time on this one.

> [APPELLANT'S COUNSEL]: Were you waiting on that information as to whether or not there was [an] outstanding warrant for 10—for five minutes?

> [DETECTIVE COLEMAN]: I would say probably about five minutes.

> [APPELLANT'S COUNSEL]: It could have been 10 minutes?

> [DETECTIVE COLEMAN]: It could have been 10.

> [APPELLANT'S COUNSEL]: As a matter of fact, *it could have been as much as 15 to 20 minutes, couldn't it?*

> [DETECTIVE COLEMAN]: *I don't recall.* I would recall if it was too long, if it was unusually long. Most times they're pretty quick about that. *Within 10 minutes is normally the rule, that they're within 10.*

> [APPELLANT'S COUNSEL]: So he was just standing there waiting until [sic] verified your call?

Appellant's appellate counsel, in his brief as well as during oral argument, relied exclusively on the testimony offered by appellant and the witnesses called on his behalf. They related at trial that, after appellant told Detective Coleman his name,

the detective ordered him to "get over to a fence." A critical difference in the testimony of appellant's witnesses and Detective Coleman was that appellant and Wilson aver that Detective Coleman handcuffed appellant immediately after he was unable to produce identification and, significantly, *before* the discovery of the two outstanding Prince George's County bench warrants. Additionally, appellant testified that his detention lasted fifteen to twenty minutes. We remind appellant's counsel that, as we noted *supra*, on appeal from a suppression hearing, we defer to the factual findings and the resolution of issues of credibility made by the judge who presided at the suppression hearing. Thus, our determination of the legality, *vel non*, of the initial stop and when, in fact, the actual arrest occurred, must be based on the facts as found by the suppression judge.

The Court of Appeals observed in *Jones v. State*, 343 Md. 448, 457–58, 682 A.2d 248 (1996):

> When the question is whether a constitutional right, such as, as [sic] here, a defendant's right to be free from unreasonable searches and seizures, has been violated, the *reviewing court makes its own independent constitutional appraisal, by reviewing the law and applying it to the peculiar facts of the particular case.* When the facts are in dispute, deference is paid to the trial court, that is, its findings of fact are accepted unless they are clearly erroneous. In making the latter determination, the [C]ourt must give "due regard to the opportunity of the trial court to judge the credibility of the witnesses." When the motion to suppress has been denied, the only relevant facts "are ... those produced at the suppression hearing, ... which are most favorable to the State as the prevailing party on the motion." On the other hand, when the motion is granted, the evidence produced at the suppression hearing must be considered in the light most favorable to the defendant.

(Emphasis added; citations omitted).

As the *Jones* Court continued:

Determining the credibility of witnesses and the weight of the evidence produced at trial are not matters entrusted to the appellate courts. Credibility is defined as "worthiness of belief; that quality in a witness which renders his [or her] evidence worthy of belief." Credibility is also defined as "the quality or power of inspiring belief."

*Id.* at 465, 682 A.2d 248 (citations omitted).

Appellant, then, was detained five minutes and was handcuffed after receipt of the information regarding the outstanding warrants.[3]

## MINIMIZATION OF GOVERNMENTAL INTRUSION

As we previously mentioned, we believe a delineation of the position of an accosting as it relates to governmental invasions is helpful in explicating its role in investigative confrontations. At the outset, an accosting, which from the totality of the circumstances can be objectively demonstrated to be consensual, is not a governmental invasion at all. Because the purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but only to prevent arbitrary and oppressive interference by enforcement officials, encounters which do not involve such arbitrary and oppressive interference are not subjected to constitutional review. It is only at the point in time when an encounter is no longer consensual, resulting in an involuntary detention, that a Fourth Amendment analysis is required. Whether a Fourth Amendment constitutional analysis addresses the lawfulness of

---

3. At the suppression hearing, Detective Coleman had originally indicated that the detention lasted five minutes, then acknowledged it could have been ten minutes, but he could not recall if it was as much as fifteen to twenty minutes. As we have previously noted, we extend great deference to the fact-finding of the suppression hearing judge with respect to determining first-level facts. Moreover, we must review those facts in the light most favorable to the State, as the prevailing party. Consequently, even though Detective Coleman testified that "it could have been ten minutes" that passed while appellant and the officers awaited the results of the request for a warrant check, our discussion will proceed on the basis of Detective Coleman's initial statement that, "I would say probably five minutes."

a warrantless search or arrest by State agents, at one end of the spectrum, or the requirements for an applicant seeking a warrant to conduct a wiretap to uncover suspected criminal activity, at the other end of the spectrum, the overarching principle, as we observed in *Graham*, 119 Md.App. at 453, 705 A.2d 82 (quoting *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997)), is:

> We reversed, explaining that "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion,'" and that reasonableness "depends 'on a balance between the public interest and the individual[']s right to personal security free from arbitrary interference by law officers.'"

 Stated otherwise, no invasion of the individual's right to be free from arbitrary interference from law officers is constitutionally tolerated absent a demonstrated public interest involved, in which case, it can be said that the intrusion is no longer arbitrary. The touchstone of such an analysis is that a more intrusive governmental action requires a demonstrably more substantial legal basis in order to pass constitutional muster. We hasten to point out, however, that, notwithstanding the principle that a minimally intrusive governmental action will more likely be viewed as reasonable when subjected to a Fourth Amendment analysis, law enforcement authorities are not obligated to use the least intrusive means available to verify or dispel their suspicions that the law is being violated. *State v. Lemmon*, 318 Md. 365, 378, 568 A.2d 48 (1990). As the Court of Appeals explained in *Lemmon:*

> The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift on-the-spot decisions ... and it would require courts to "indulge in 'unrealistic second-guessing.'"

*Id.* at 378, 568 A.2d 48 (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

■ We begin with the proposition that a pedestrian, who has committed no criminal act, has the unfettered right to freedom of movement on a public street without interference from law enforcement officers. In descending order of intrusiveness, these are the requirements for there to be a constitutionally sanctioned interference from law enforcement officers:

**Stop, Search, or Arrest, Pursuant to a Warrant**— Extreme governmental intrusion resulting in possible loss of liberty in addition to temporary restriction of movement— permitted because, in addition to facts tending to establish that a crime has been committed and suspect is criminal agent, neutral arbiter, magistrate, or judge with legal knowledge superior to officer has reviewed facts and indicated opinion that they constitute probable cause.

**Warrantless Stop, Search, or Arrest**—Extreme governmental intrusion resulting in possible loss of liberty in addition to temporary restriction of movement—permitted because of the exigency of a felony having been committed or a misdemeanor being committed in officer's presence, i.e., because of the ability to personally verify the commission of the offense.

**Stop, Pursuant to _Terry v. Ohio_**—Less intrusive governmental action resulting initially in temporary restriction of movement—permitted when officer observes suspicious activity indicating criminal activity afoot; bases include officer's experience, knowledge of suspect's criminal history, high crime area; officer may conduct limited "pat-down" of outer garments to detect weapons when officer has apprehension for his or her safety.

**Accosting**—Only minimally intrusive governmental action resulting in no restriction of movement—permitted as long as inquiry involves no show of authority and objective circumstances indicate a reasonable person would feel free to leave.

_See Ferris,_ 355 Md. at 374 n. 5, 735 A.2d 491 (citing _Commonwealth v. Sierra,_ 555 Pa. 170, 723 A.2d 644 (1999) (setting

forth three tiers of interaction between a citizen and the police)).

## ACCOSTING

*Webster's Third New International Dictionary, Unabridged* (1986), defines "accosting" as:

to approach and speak to; speak to without having first been spoken to; to confront, usu[ally] in a somewhat challenging or defensive way; to address abruptly (as in a chance meeting) and usu[ally] with a certain degree of impetuosity or boldness; . . . .

A consensual encounter, on the other hand, has been defined as:

simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official. Because an individual is free to leave during such an encounter, he [or she] is not "seized" within the meaning of the Fourth Amendment.

*United States v. Werking,* 915 F.2d 1404, 1408 (10th Cir., 1990); *see also United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir., 1990).

Although judicial decisions speak in terms of a "mere accosting" being a non-constitutional event, an "accosting" references only the actions of the police without respect to the response of the person accosted. An accosting may continue to be a non-constitutional event if: 1) the citizen consents to answer questions or otherwise cooperates and 2) that consent is not the result of physical force or a show of authority by police signaling that compliance with the requests of law enforcement officers is required. Thus, notwithstanding federal and State decisions that hold an "accosting" is a non-constitutional event, it ceases to be so when the circumstances demonstrate that the purported consensual response of the citizen is the product of coercion.

Typically, an accosting occurs when police officers approach a citizen and ask for information, usually one's name,

address, date of birth, destination, point of origin, and contents of luggage or vehicle. To be sure, the principal investigative technique in law enforcement is the so-called "field interview." Virtually all such interviews conducted during the course of an officer's duties are done for the purpose of gathering information to ferret out criminal offenses or to elicit from witnesses facts relative to a criminal event or an ongoing investigation. We certainly recognize an officer's right—indeed, his or her responsibility—to conduct inquiries regarding criminal activity. Simply put, that is what they do. It is only when police "indicate that compliance with their requests is required by means of physical force or show of authority" that the gears of the Fourth Amendment are engaged. *Stanberry v. State*, 343 Md. 720, 730, 684 A.2d 823 (1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1692, 137 L.Ed.2d 819 (1997).

When the officer suspects the person interviewed of having committed a crime and makes a general inquiry, decisions predating the requirement that a stop be based on a reasonable particularized articulable suspicion have held that an admission in response to the general inquiry may provide the basis of a further detention or arrest.

In *Cornish v. State*, 215 Md. 64, 137 A.2d 170 (1957), the Court of Appeals explained: "One is not arrested when he [or she] is approached by a police officer and merely questioned as to his [or her] identity and actions. This amounts to no more than an accosting."

In another case, a plainclothes police officer told appellant, as he alighted from an automobile, "I want those lottery tickets you have on you," to which appellant replied, "There they are in my coat pocket. Take them." *Blager v. State*, 162 Md. 664, 161 A. 1 (1932). The Court held that the subsequent arrest was lawful because Blager's admission amounted to commission of a misdemeanor in the presence of the officer. Had he "been passive and silent when confronted with the sergeant's implied accusation," said the court, "he would have been immune from any police interference until a warrant had

been procured." *Id.* at 666, 161 A. 1. To like effect, *see Robinson v. State*, 200 Md. 128, 88 A.2d 310 (1952). These earlier decisions involve non-custodial admissions, in response to accusatory inquiries, which provided the basis for probable cause and, as we noted, *supra*, they predate decisions requiring that a stop be based on reasonable articulable suspicion.

An accosting as a viable investigatory technique survives the strictures of *Terry v. Ohio, supra*, and *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), so long as the circumstances, viewed against an objective standard, indicate that the encounter is consensual and that a reasonable person would feel free to end the encounter and simply walk away. A survey of State and federal decisions that discuss whether an accosting implicates the Fourth Amendment is instructive.

In *Jones v. State*, 319 Md. 279, 572 A.2d 169 (1990), Jones had been riding his ten-speed bicycle at approximately 3:20 in the morning, when the police officer observed him carrying clothes across his shoulders that appeared to be on hangers. Because of recent burglaries in the area, and because Jones was proceeding from the direction of a dry cleaning establishment six blocks away, the officer hailed him, stating, "Hey, could you come here" or "Hold on a minute." As Jones alighted from the bicycle, the officer testified that he noticed a bulge in Jones's jacket pocket and, after patting him down, retrieved a twenty-five caliber pistol. A search of a grocery bag in Jones's possession, revealed fourteen capsules containing cocaine, a quantity of marijuana, one pack of rolling paper, and a billfold containing five small vials of cocaine.

We affirmed the trial court's conviction in an unreported opinion, characterizing the initial encounter as a "mere accosting," not within the protection of the Fourth Amendment. We had reasoned that Jones was free to disregard Officer Brown's salutation and continue on his way because "there were no signs of force or weapons used to effectuate the stop and because Jones stopped voluntarily in a cooperative and polite manner, no seizure of Jones had occurred." *Jones*, 319 Md. at

282, 572 A.2d 169. Concluding that the officer admitted he had no knowledge of any specific crimes having been committed during the early morning hours nor of any burglaries having occurred in the area that night, the Court of Appeals held, "Mere hunches are insufficient to justify the stop of a citizen riding a bicycle on a public street." Continued the Court, "We said that tenuous facts constituting a 'reasonable suspicion' would be perilously close to entitling a policeman [or policewoman] 'to seize and search every person whom he [or she] sees on the street.' " *Id.* at 288, 572 A.2d 169 (quoting *Anderson v. State,* 282 Md. 701, 707, 387 A.2d 281 (1978) (quoting *Sibron,* 392 U.S. at 64, 88 S.Ct. 1889)). Citing *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the *Jones* Court discussed the nature of a voluntary stop:

> Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him [or her] if he [or she] is willing to answer some questions, by putting questions to him [or her] if the person is willing to listen, or by offering in evidence in criminal prosecution his [or her] voluntary answer to such questions. Nor would the fact that the officer identified himself [or herself] as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, need not answer any questions put to him [or her]; indeed, he [or she] may decline to listen to the questions at all and may go on his [or her] way. He [or she] may not be detained *even momentarily without reasonable objective grounds for doing so,* and his [or her] refusal to listen or answer does not, without more, furnish those grounds.

*Jones,* 319 Md. at 284, 572 A.2d 169 (emphasis added).

 The *Jones* Court, quoting *Terry v. Ohio, supra,* reiterated the standard announced by the Supreme Court in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), as to what distinguishes a seizure from an accosting. It is only when the police "by some means of

physical force or show of authority detain an individual, thereby restraining the person's liberty," that a seizure occurs. The Court of Appeals, in *Jones*, continued:

> In 1980, the Supreme Court in *Mendenhall* described the extent of the restraint on a person's freedom of movement which distinguishes the seizure of a *person from a mere accosting*. No seizure occurs when an individual to whom questions are put remains *free to disregard the questions and walk away*. 446 U.S. at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509. Under these circumstances, Justice Stewart, writing for the Court, explained that a person has not been seized if there is no restraint on the person's freedom of movement. The person may disregard the questions put forth by the police officer and continue on his [or her] way.

*Jones*, 319 Md. at 283, 572 A.2d 169 (emphasis added).

In *Lemmon, supra*, three Baltimore City policemen received a tip from a dispatcher, who did not know the source of the information, that "some narcotics transaction was going on" in the 2400 block of Kermit Court in Baltimore City. As they approached that location, two of the officers alighted from their vehicle and saw a black male, the appellant, talking to another black male. The appellant began to walk away when the officers were approximately twenty-five feet from him and his companion and, when one of the officers identified himself as a police officer, "Lemmon took off running." After a chase in which Lemmon avoided a police car driven by the third police officer, one of the pursuing officers saw him pull a "medicine-type vial" out of his jacket pocket and attempt to force it through a chain linked fence, the vial bouncing off and falling to the ground.

After a continued chase, the officers cornered Lemmon and ordered him to the ground. The narrow question presented in *Lemmon*, in light of *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), was whether the State was correct in interpreting *Brower* to hold that "no seizure takes place until the restraining effect of a police command actually occurs, i.e., when the person is within the police

officer's physical control." For purposes of the discussion of the issues in the case at hand, the Court of Appeals, in *Lemmon,* reaffirmed its earlier holdings in *Watkins v. State,* 288 Md. 597, 420 A.2d 270 (1980), and *Anderson v. State, supra,* in which it referred to the "bedrock constitutional law" pertaining to search and seizure announced in *Terry v. Ohio:* " 'whenever a police officer accosts an individual and restrains his [or her] freedom to walk away, he has "seized" that person [within the meaning of the Fourth Amendment].' " *Id.* at 376, 568 A.2d 48.

Pertinent to our discussion in the case at hand regarding when facts warranting a stop must come to the officer's attention, the Court said:

> The Court observed [in *Terry* ] that[,] "whenever a police officer accosts an individual and restrains his [or her] freedom to walk away, he [or she] has 'seized' that person" [within the meaning of the Fourth Amendment].

> We said in *Anderson* [, 282 Md.] at 704–705, 387 A.2d 281 (citations omitted):

>> The central inquiry is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *In determining whether the intrusion was justified at its inception, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."* The reasonableness of an intrusion is to be assessed against an objective standard—whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate."

*Lemmon,* 318 Md. at 376, 568 A.2d 48 (emphasis added).

In a case in which Maryland State Police, assigned to drug interdiction at the Maryland House, removed an unclaimed bag belonging to a passenger who had not reboarded the Greyhound bus, the Court of Appeals, in primarily focusing on

the issue of whether the bag had been abandoned, said in *Stanberry*, 343 Md. at 742, 684 A.2d 823:

[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him [or her] if he [or she] is willing to answer some questions, by putting questions to him [or her] if the person is willing to listen, or by offering in evidence in a criminal prosecution his [or her] voluntary answers to such questions....

... Thus, police may approach private citizens and ask questions or ask for identification without individualized suspicion or probable cause, provided the encounter is consensual....

*Id.* (quoting *Royer*, 460 U.S. at 497, 103 S.Ct. at 1324 (citations omitted) (citing *Mendenhall*, 446 U.S. at 559, 100 S.Ct. at 1879–80)).

In a case in which two Baltimore City Police Detectives observed a suspect carrying two portable radios shortly after a Realistic brand radio, a ring, and watch had been stolen from an apartment in the same block in which they were cruising, we said, in affirming the motions court's denial of appellant's motion to suppress in *Martin v. State*, 51 Md.App. 142, 147–49, 442 A.2d 191 (1982):

While the Supreme Court in *Terry* held that whenever a police officer accosts an individual and restrains his [or her] freedom to walk away he has seized the person, the Court noting the "rich diversity" of police-citizen encounters also observed: "Obviously, not all personal intercourse between policemen [or policewomen] and citizens involve 'seizures' of persons. Only when the officer by means of physical force or show of authority has in some way restrained the liberty of a citizen may it be concluded that a seizure has occurred."

... *See United States v. Wylie*, 569 F.2d 62, 67 (D.C.Cir. 1977) where the Court, in reliance on the above-quoted language from *Terry* observed:

But police-citizen communications which take place under circumstances in which the citizen's ["]freedom to walk

away["] is not limited by anything other than his [or her] desire to cooperate do not amount to ["]seizures["] of the person, and consequently may be initiated without a reasonable, articulable suspicion, much less probable cause.

. . .

We adhere to the view that a person is ["]seized["] only when, by means of physical force or a show of authority, his [or her] freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but ["]to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals. . . . As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

(Citations omitted.)

In a more recent decision, *Lawson v. State, supra,* a Frederick County Police Officer was patrolling the area of an apartment complex at approximately 7:45 in the evening when he drove past appellant in a legally parked vehicle in an area known for high drug activity. After circling the complex, he noticed that the vehicle, bearing West Virginia tags, had not moved; as he drove up behind it, the vehicle began to back up whereupon the officer activated his emergency lights to "cause the vehicle to stop." *Id.* at 613, 707 A.2d 947.

In response to the officer's question as to why he was there, Lawson replied that his car had overheated, at which time the officer attempted to verify the appellant's story by ordering him to start his vehicle, thereby allowing the officer to check the heat gauge, which did not indicate that the car had overheated. At this point, the officer ordered the appellant

out of the car and administered a field sobriety test because he had noticed the odor of alcohol. As a result of the test, the officer concluded that Lawson was under the influence of alcohol, resulting in his prosecution and conviction for driving under the influence of alcohol. In holding that the activation of the officer's vehicle's emergency lights constituted a stop unsupported by sufficient reasonable articulable suspicion, we observed:

> Ordinarily, approaching a parked vehicle to question occupants about their identity and actions is a mere accosting and not a seizure.... But, it is more than a mere accosting when the police attempt to detain a suspect for questioning through the use of police power and the suspect submits. The approach then becomes a seizure and must be justified by a reasonable articulable suspicion that criminal activity is afoot.

*Lawson,* 120 Md.App. at 614, 707 A.2d 947 (citations omitted).

Significantly, we noted in *Lawson,* 120 Md.App. at 615, 707 A.2d 947, that *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), clarified that *Mendenhall* establishes that the test for existence of a "show of authority" is an objective one determined by whether the officer's words and actions would have conveyed to the citizen that his or her freedom of movement was being restricted, rather than the citizen's perception. As Reynolds points out, Judge Sonner, writing for this Court, also opined that the discovery of facts subsequent to the stop cannot overcome a stop that started without enough to justify detention, adding that our analysis begins and ends at the point of constitutional seizure. *Id.* at 618, 707 A.2d 947 (citing *Terry v. Ohio, supra* ).

In *Ferris,* a Maryland State Trooper, operating a laser speed gun on an interstate in Western Maryland, clocked the vehicle driven by Ferris at ninety-two miles per hour. He activated his emergency lights and stopped the vehicle and asked the driver, Ferris, to produce his driver's license and registration. According to the trooper, he noticed that Ferris's eyes were bloodshot, that he appeared "a little nervous, a

little fidgety." During the time that the trooper returned to his patrol car and requested a driver's license and outstanding warrant check, he noticed that Ferris and his passenger were "moving around and looking back toward him quite frequently." As the trooper was writing the citation, a deputy sheriff arrived and parked ten feet behind the trooper's vehicle, activating his vehicle's emergency flashers. After the trooper returned to the Ferris vehicle and the latter signed the citation, the trooper returned the driver's license and registration to Ferris, along with the citation. Immediately thereafter, the trooper "just asked [Ferris] if he would mind stepping to the back of his vehicle to answer a couple questions." The trooper indicated that Ferris said that he did not mind.

The trooper testified, at the suppression hearing, that the reasons he asked Ferris to step out of the car were that his eyes were bloodshot and he and his passenger were acting very nervous, and there was no detectable odor of alcohol on petitioner's breath, leading the trooper to believe that there may have been some drug use on the part of the driver. The trooper again asked Ferris whether he was sure that he had not smoked any drugs because of the fact that his eyes were bloodshot and he did not have any alcohol on his breath.

At this point, Ferris admitted that he and his passenger "had smoked a joint in Philadelphia about three hours earlier." *Ferris*, 355 Md. at 364, 735 A.2d 491. Ferris then stated that he and his passenger were traveling from Philadelphia to Morgantown, West Virginia and, upon further questioning, Ferris acknowledged that his passenger possessed a small amount of marijuana. The trooper approached the passenger, Discher, still seated in the front passenger seat of the vehicle, and questioned him, at which time he turned over a small baggie containing marijuana. A search of the rear seat uncovered a green L.L. Bean bookbag containing a gallon-sized plastic baggie in which was found green vegetable matter, believed at the time by the trooper to be marijuana.

Citing several prior decisions from the Court of Appeals and this Court, the Court concluded that the trooper and the

deputy sheriff had concluded their business once the citation was signed and the request to step out of the car and submit to further interrogation constituted a second stop, pursuant to the cases cited. *Snow v. State,* 84 Md.App. 243, 578 A.2d 816 (1990); *Munafo v. State,* 105 Md.App. 662, 660 A.2d 1068 (1995). Discussing whether an encounter constitutes a stop or a seizure, the Court said:

> The test to determine whether a particular encounter constitutes a seizure, or whether the encounter was simply a "consensual" non-constitutional event is whether a reasonable person would have felt free to leave. A seizure can occur by means of physical force, or show of authority along with submission to the assertion of authority. If a reasonable person would have felt free to leave, no seizure occurred. Conversely, if a reasonable person would have felt compelled to stay, a seizure took place. The focus, then, is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." The key inquiry has also been characterized as whether "the police conduct would 'have communicated to a reasonable person that he [or she] was not at liberty to ignore the police presence and go about his [or her] business.'"

*Ferris,* 355 Md. at 375–76, 735 A.2d 491 (citations omitted).

Judge Raker, speaking for the Court, quoted, with approval, Judge Thieme's dissent from our decision affirming the trial judge:

> The appellant had already been lawfully detained pursuant to a traffic infraction and, after a license check had been completed and a speeding violation had been issued, Officer Smith requested that the appellant exit and step to the rear of the vehicle. A reasonable person, on the return of his [or her] license and registration and the acceptance of a citation, would (most assuredly with relief) have viewed the traffic stop as over. *And, at that point, a reasonable person would have felt free to leave. For the officer then to request the driver to exit the vehicle, separating the driver not only from the vehicle but also from any occupants who may have been in that vehicle (as was the passenger in this*

*case), with no apparent justification for doing so, would clearly arouse a feeling that that person was not free to leave.* Furthermore, the presence of two officers (one a county [police officer] and one a State police officer) would have only added to the already mounting apprehension on the part of the driver.

*Id.* at 367, 735 A.2d 491 (emphasis added).

 From the above, all of the authorities cited hold that a seizure of the person occurs—and hence a voluntary encounter ends—when the attendant circumstances demonstrate objectively that a reasonable person no longer feels free to end the encounter and walk away when police "indicate that compliance with their requests is required by means of physical force or show of authority." *Stanberry,* 343 Md. at 730, 684 A.2d 823.

### LENGTH OF THE DETENTION

In *Graham,* 119 Md.App. at 458–468, 705 A.2d 82, we reviewed several federal and State decisions that discuss the brevity of a detention as an "important factor in determining whether a *Terry* stop was so minimally intrusive as to be justifiable on reasonable suspicion" (quoting *Snow,* 84 Md. App. at 265, 578 A.2d 816). We cited *Royer,* 460 U.S. at 500, 103 S.Ct. 1319, for the often stated proposition that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Graham,* 119 Md.App. at 467, 705 A.2d 82. In the case at hand, the fact that appellant was detained five minutes is less critical to our determination of the legality, *vel non,* of the encounter and the subsequent seizure of the illicit drugs, because *Terry, Royer,* and *Snow* consider a governmental intrusion in which the detainee is held *against* his or her will and his or her compliance with the orders of law enforcement officers is the result of submission to authority.

In theory, a consensual accosting does not involve a detention which connotes "a period of temporary custody" or "a holding back." *Webster's Third New International Dictio-*

*nary, Unabridged* (1986). "Custody" is the antithesis of a voluntary encounter, which requires the consent of the person interviewed. Thus, the only significance of the length of the encounter is the circumstance that a brief encounter is more likely than an extended encounter to be voluntary and what transpires during an extended encounter may be illuminative of whether the encounter was, in fact, consensual from its inception. In other words, if a citizen's initial decision to answer law enforcement officers' questions was the result of a reasonable belief that compliance with their request is required because the police have exerted physical force or exhibited a show of authority or, if by such physical force or show of authority, the citizen objectively feels he or she is not free to leave at any point in the encounter, it is irrelevant whether the encounter is momentary or lasts several hours.

In a case wherein it is conceded that there is no alternative theory of a stop based on reasonable articulable suspicion, a seizure of the person has occurred at the point in time when the citizen's purported voluntary cooperation is shown to have ended or, if such acquiescence is the result of a show of authority at the outset, then the seizure occurred at the time of the initial accosting. In such a case, the result is that the citizen is subjected to an illegal arrest if the consensual nature of the encounter ends at any time before discovery of evidence or information which establishes reasonable articulable suspicion or probable cause.

Decisions predating the *Terry* decision, which discuss the nature of an accosting, as we noted, *supra,* contemplate, in the main, an "inquiry" about a citizen's identity and actions for the purpose of detecting violations of the law through the interview itself. These decisions were prior to current telecommunications through which one may discover information that establishes probable cause and involved uncovering criminal activity in conjunction with the interview without the extrinsic data now available via teletype.

Subsequent to these earlier cases, many of the decisions that involve interdiction of drug couriers at train stations and

airports sanction an accosting resulting in obtaining incriminating information or evidence directly from the person interviewed, without the necessity of waiting for receipt of a teletype or further information. In such cases, there is a seamless transition from the initial accosting to the consensual search or incriminating admission. The net result is that a "prolonged" encounter during which there is no meaningful interaction between the citizen and police is more indicative of an involuntary rather than a voluntary encounter. (*See Ferris*, 355 Md. at 378, 735 A.2d 491, alluding to "prolonged" nature of encounter.)

## THE INSTANT CASE

As we have previously observed, the point in time when appellant was under arrest or, in other words, when one has been seized (in this case, the encounter is no longer voluntary) within the meaning of the Fourth Amendment is "whether under all of the circumstances surrounding the incident, a reasonable person would not believe he [or she] was free to leave." *Lemmon, supra,* (citing *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985))). An involuntary detention, on the other hand, must be based on reasonable articulable suspicion and the intrusion permitted "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Snow*, 84 Md.App. at 265, 578 A.2d 816 (citing *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319 (1983)). Moreover, applying the standard employed by the Supreme Court in *Terry* stop cases, "the brevity of the invasions of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on [reasonable suspicion]." *Snow*, 84 Md.App. at 265, 578 A.2d 816 (citing *United States v. Place*, 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983)).

In the case *sub judice*, we need not be concerned with whether Detective Coleman had reasonable articulable suspi-

cion for a *Terry* stop, given the State's concession and our independent constitutional appraisal that, on the facts of this case, the encounter was either consensual or a stop unsupported by the requisite constitutional predicate. We are required only to determine whether a reasonable person would have felt free to end the encounter and to leave at any point in time from the initial accosting to the time of his or her arrest. *Ferris,* 355 Md. at 376, 735 A.2d 491 (1999). Some relevant factors to be considered are: 1) the time and place of the encounter, 2) the number of officers present and if they were uniformed, 3) whether the police moved the person to a different location or otherwise isolated him or her from others, 4) whether the police informed the person that he or she was free to go, 5) whether the police indicated that the person was suspected of a crime, 6) whether the police retained any of the person's documents, and 7) whether the police demonstrated any threatening behavior or physical contact to indicate that the person was not free to go. *Id.* at 377, 735 A.2d 491.

These seven factors tend to establish, objectively, circumstances from which we may discern an atmosphere that is not coercive. These factors also may establish the exertion of physical force or the exhibition of a show of authority. We believe that, in addition to these factors, the objectively demonstrated belief of appellant that the police had not concluded their inquiry is an additional factor that supports the notion that he was obliged to remain in the company of the officers until they had concluded their inquiry. Ironically, it is the language in Judge Chasanow's dissent in *Ferris*—the majority decision of which is essentially supportive of the proposition that the encounter at hand was consensual—that most dramatically buttresses the argument that, applying an objective standard, appellant would not have felt free to leave.

Judge Chasanow opined: "Had the trooper made his 'requests' *before* returning the license and registration or before the ticket was signed, then the defendant would not have felt free to leave; but, once the license and registration were returned and the ticket was signed, the trial judge could determine that the trooper signaled to the defendant that he

was free to leave." *Id.* at 395, 735 A.2d 491 (emphasis added). Patently, the converse of Judge Chasanow's reasoning is applicable to the case at bar, i.e., had Detective Coleman concluded his warrant check and subsequently attempted to subject appellant to further questioning on a "voluntary" basis, assuming, *arguendo,* that the results of the requested information had not established probable cause, under Judge Chasanow's thesis, this scenario would be a factor in support of appellant's objective belief that he was free to leave. Because Detective Coleman had not concluded his inquiry until receipt of the results of the warrant check, in Judge Chasanow's words, "the defendant would not have felt free to leave."

In *Ferris,* unlike the case at bar, there had been a prior lawful basis for Ferris's detention. As the Court of Appeals observed, "the pre-existing detention of Ferris, properly sustained by the probable cause for the speeding violation, combined with the other factors we have identified, leads to the conclusion that a reasonable person in Ferris's position would believe that continued submission to Trooper Smith was required." *Ferris,* 355 Md. at 379, 735 A.2d 491. The Court further opined: "This pre-existing seizure enhanced the coercive nature of the situation and the efficacy of the other factors in pointing toward the restriction of Ferris's liberty." *Id.* at 378, 735 A.2d 491.

Of course, there was no pre-existing detention of appellant in the case *sub judice.* Although there can be no doubt that the pre-existing seizure to which the Court alludes, in *Ferris,* enhanced the coercive nature of the situation, the actions of the police in this case were equally coercive because of the lack of any apparent justification for their inquiry, a circumstance *Ferris,* citing Judge Thieme's dissent, found to be disarming. At least Ferris knew why the police had stopped him and, notwithstanding the intimidating character of the prior seizure, he was in a superior position to consider his options. Appellant, on the other hand, was approached for no apparent reason and subjected to an inquiry without there having been the legal basis for a pre-existing seizure. The

inquisitorial nature of the accosting itself, while not the equivalent in its coercive impact to a prior seizure, certainly has the effect of disarming the average person. The act of alighting from a marked police vehicle and, significantly, singling out appellant as he departed from the location where he had congregated with eight or nine companions are circumstances which patently would be coercive to a reasonable. person. Moreover, applying the test set out in *Michigan v. Chesternut*, 486 U.S. 567, 578, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), that "we focus on what the person's immediate 'business' was" in order "to determine whether a reasonable person would have felt free to disregard the police and go about his [or her] business," appellant was leaving the scene of the encounter when he was accosted; thus, it is unlikely that answering the questions put to him and his subsequent remaining at the scene was voluntary.

That appellant felt obliged to remain until the warrant check had been completed is reinforced by the fact that the initial accosting in which he was asked his name and date of birth could not have taken more than a minute, followed by a five-minute delay. He thereafter was obliged to wait without any further meaningful interchange between himself and the officers. Detective Coleman testified: "Like I said, I was on my radio [sic] we were calling in. But he was just standing there. All three of us were standing on the sidewalk." In a case admittedly factually dissimilar to the case under review, we alluded to this "dead time" when officers inexplicably engage the person detained:

> One characterization of the encounter, given by the police as they attempted to explain what they were doing over this protracted period of time, strikes us as absolutely bizarre. They claim that they and the two detainees were, for a large part of the time, just "chatting."

*Alfred v. State*, 61 Md.App. 647, 661, 487 A.2d 1228 (1985). A reasonable person, having initially walked away when the police arrived, would not *voluntarily* stand idly by for five minutes awaiting the results of the warrant check.

Turning to the seven factors enunciated in *Ferris,* we believe that, although advisement that a citizen is free to go is not constitutionally mandated, it is an important factor to be considered. As Judge Raker, writing the majority opinion in *Ferris,* observed:

> We recognize that the police are not required to inform citizens that they are free to leave before getting consent to search a motor vehicle. In *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (*Robinette II* ), the Supreme Court rejected a *per se* constitutional requirement "that a lawfully seized defendant must be advised that he [or she] is 'free to go' before his [or her] consent to search will be recognized as voluntary." Nonetheless, the Court reiterated that " 'knowledge of the right to refuse consent is one factor to be taken into account' " in determining the voluntariness, and thus constitutional validity of a defendant's purported consent. Consequently, an officer's failure to advise a motorist that he or she could refuse, or was free to leave, remains a factor to be considered. As Justice Stewart's opinion for the majority in *Mendenhall* recognized:
>
> > [I]t is especially significant that [Mendenhall] was twice expressly told that she was free to decline to consent to the search, and only thereafter explicitly consented to it. Although the Constitution does not require proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search, *such knowledge was highly relevant to the determination that there had been consent.* And, perhaps more important for present purposes, the fact that the officers themselves informed [Mendenhall] that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive.

*Ferris,* 355 Md. at 379–80, 735 A.2d 491 (citations omitted; footnote omitted).

As we have observed, appellant was already in the process of walking away once he became aware of the police presence and he was intercepted as he was in the process of leaving.

That he suddenly had a change of heart and remained of his own volition runs counter to what we would expect from an individual so situated. Had appellant been advised that he was free to leave, as the detainee was so advised regarding the search in *Mendenhall,* there can be no doubt that he would not have remained.

Considering the number of officers present and whether they were uniformed, in conjunction with whether the police demonstrated any threatening behavior or physical contact to indicate that appellant was not free to leave, we are mindful of what the Court said in *Ferris,* 355 Md. at 383, 735 A.2d 491:

> ... [t]he presence of two uniformed law enforcement officers increased the coerciveness of the encounter. Not only had the second officer, Deputy Martin, been present for several minutes before Trooper Smith ended the traffic stop but the record also indicates that the deputy had positioned himself at the passenger side of the car when Trooper Smith asked Ferris to exit the Camary [sic].

Thus, given the fact that Detective Coleman and Officer McNamara, a uniformed police officer, who had alighted from a marked police vehicle under circumstances which had caused eight or nine of appellant's companions to flee, we can only conclude that the actions of the police in this case were sufficiently threatening to dissuade appellant from continuing his departure from the scene. As to whether the police had indicated to appellant that he was suspected of committing a crime, no such suggestion was made for the simple reason that there was never any information that the officers possessed that a crime had been committed and, in fact, Detective Coleman testified that the reason he intercepted appellant was because he was not familiar with him.

Although there was no testimony that Detective Coleman and Office McNamara moved appellant to a different location or otherwise isolated him from others, it is undisputed that appellant remained at the location where he had been stopped until the officers were able to complete their mission. Because the officers were not seeking appellant's voluntary

cooperation or acquiescence in a request to consent to a search or in an attempt to have him incriminate himself, the significance of a suspect's removal to a hostile or unfriendly environment as it bears upon the issue of the voluntariness of the encounter is not particularly revealing because appellant's identity and date of birth were elicited at the time of the initial accosting and the officers' objective was achieved by detaining appellant at that location until receipt of the results of the request for a warrant check.

Obviously, neither Detective Coleman nor Officer McNamara had occasion to retain any of appellant's personal effects because they never obtained any from him. Thus, this factor is wholly inapplicable to a determination of whether objectively appellant would have felt free to leave. Of the seven factors articulated in *Ferris*, the time and place of the encounter, we conclude, is the only factor which weighs in favor of a consensual accosting. Detective Coleman and appellant testified that the encounter occurred at approximately 3:30 on the afternoon of March 24, 1998 on a public street in Anne Arundel County. Admittedly, there was nothing threatening or intimidating *per se* about the time and place of the encounter. We are persuaded, however, that, weighed against the other pertinent factors, the circumstances as gleaned from the evidence favorable only to the State lead to the inescapable conclusion that, objectively, a reasonable person in appellant's position would not feel free to walk away and that the police action constituted a show of authority sufficient to engender appellant's submission.

In reaching this conclusion, we are mindful of the explication of the Supreme Court in *Chesternut*, 486 U.S. at 574, 108 S.Ct. 1975 (quoted in *Ferris*, 355 Md. at 376, 735 A.2d 491):

> The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person that he [or she] is not free to "leave" will vary, not only with the particular police conduct

at issue, but also with the setting in which the conduct occurs.

Judge Hollander, writing for this Court in a recent decision in which the detainee was questioned by the police about unquestionably suspicious circumstances, discussed the factors which indicate that a person is not free to end questioning and walk away:

In *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), the Supreme Court indicated that custody may be found when "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 112, 116 S.Ct. 457. Moreover, the Court of Appeals has said that the trial court must consider, *inter alia*, whether the suspect is "physically deprived of his [or her] freedom of action in any significant way or is placed in a situation in which he [or she] reasonably believes that his [or her] freedom of action or movement is restricted by such interrogation." *Whitfield v. State*, 287 Md. 124, 140, 411 A.2d 415 (1980) (internal quotation omitted). The " 'subjective intent' of a law enforcement officer, however, is not relevant in resolving the custody issue." *In re Joshua David C.*, 116 Md.App. 580, 593, 698 A.2d 1155 (1997). Examples of circumstances indicating a seizure include "the threatening presence of several police officers, the display of a weapon by an officer, some physical touching of the person . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870.

In our view, appellant was seized between the time of arrival of the second group of officers and when appellant indicated that he wanted to leave the area and was told that he could not do so.

*Rosenberg v. State*, 129 Md.App. 221, 240–41, 741 A.2d 533 (1999).

As to the "particular police conduct" here, referred to in *Chesternut*, Detective Coleman and Officer McNamara were

engaged in a random sweep of a neighborhood for the purpose of identifying lawbreakers, particularly drug traffickers. There is nothing in the record to indicate that their arrival was in response to a complaint or an informant's tip. The officers arrived at a location where several individuals were assembled, alighted from a marked police vehicle, accosted appellant, and asked him "what he was doing here" and "where he was from," the inquiry having been prompted solely by the fact that appellant was unfamiliar to the detective. Detective Coleman then asked appellant his name, his date of birth, and for him to produce some form of identification. After appellant failed to produce any form of identification, he was directed to wait until Detective Coleman received the results of the request for a warrant check. Considering the "setting in which the conduct occurred," appellant was in the process of leaving that location when he became aware of the police presence, the officers were uniformed and arrived in a marked vehicle and, whether appellant believed he would be less likely to arouse suspicion by simply walking away rather than fleeing, the officers were not attempting to overtake a fleeing suspect. In other words, notwithstanding that the encounter occurred in the middle of the afternoon on a public street and sidewalk, that appellant was in the process of departing from that location is a circumstance which is inconsistent with his voluntary consent to remain there for any period of time.

As mentioned earlier, we are mindful of the plethora of federal and State decisions which hold that a police officer may accost an individual on the street and ask questions. As we previously stated, however, an "accosting" is not synonymous with a "consensual encounter" because the former references only the actions of the police and evolves into the latter only when and if the circumstances, viewed against an objective standard, indicate that compliance of the person accosted is voluntary. Our analysis in the case *sub judice* devolves upon a determination of whether the actions of the police constitute a show of authority and whether appellant's corresponding responses were such that, viewed objectively, they

were responses that a reasonable person would only have made as a result of submission to authority, rather than of his or her own volition. Although a "mere accosting" provokes no constitutional inquiry, we are persuaded from the totality of the circumstances that the accosting in this case constituted a show of authority that would indicate to a reasonable person that compliance with the requests of the police was required and that such compliance, therefore, was the result of submission to authority rather than of a volitional decision to cooperate.

As appellant points out, citing *Terry* and our decision in *Snow,* 84 Md.App. at 245, 578 A.2d 816, if the officers were effecting a *Terry* stop based on the requisite factual predicate, i.e., observance of unusual conduct which leads the officer reasonably to conclude in light of his or her experience that criminal activity may be afoot and that the person with whom he or she is dealing may be armed and presently dangerous, the officer would have had a legal basis in stopping the suspect who would *not* have been justified in refusing to answer questions and simply walking away. If, on the other hand, this was a mere accosting, appellant could simply refuse to answer their questions and walk away. *Martin v. State,* 51 Md.App. at 150, 442 A.2d 191. Were we to conclude that appellant's decision to answer the questions put to him by the officers was against his will and constituted submission to a show of authority, the seizure of his person and, hence, an illegal arrest, would have occurred from the very outset of the accosting. Although it is unlikely that, employing an objective standard, a person in appellant's situation would *voluntarily* consent to provide the information requested, we need not reach that question because our determination that appellant's voluntary consent ceased at any point before probable cause was uncovered vitiates the subsequent search and seizure of the illegal drugs.

We hold that, under the totality of the circumstances surrounding appellant's five-minute detention, he was detained at the point in time when he was ordered against his will to wait until the officers received the result of the warrant check. A

more stringent test, in our view, must be applied to the voluntariness of the detention, which involves the actual deprivation of freedom of movement, than the decision whether to identify oneself to police officers on a public street.

The officers in this case could have maintained surveillance of appellant for five minutes until they had probable cause, provided by the results of the warrant check, to effect a legal arrest or, had they ascertained appellant's identity without coercion, they could have obtained the information, advised appellant he was free to leave, then arrested him when they received the report of the outstanding warrants. The seizure of any illicit drugs on appellant's person based on knowledge of the outstanding warrants at the time the drugs were retrieved would have been a seizure incident to a lawful arrest and the contraband could have been legally admitted against appellant at trial but for the prior involuntary accosting and detention. The police could not, however, in the absence of any knowledge of the outstanding warrants or any other indicia that criminal activity was afoot, restrict appellant's freedom of movement without violating appellant's Fourth Amendment right against illegal seizure of his person.

As we have observed, *supra*, the State has stated its position narrowly: that the initial approach by the police was an accosting and the subsequent encounter consensual; but, if the initial accosting and detention were not consensual and therefore illegal, the seizure of cocaine incident to the illegal arrest was likewise constitutionally infirm and the fruits thereof must be suppressed. Accepting the testimony of Detective Coleman that the encounter lasted five minutes and that appellant was not handcuffed until after receipt of information about the two bench warrants, we hold that the facts and circumstances extant here do not support the conclusion that appellant was free to leave, or that he believed he could simply walk away or that compliance with their request to answer questions was not required.

We have determined, *supra*, that an analysis of factors relevant to a *Terry* stop are inapplicable to a consensual

encounter, because no constitutional overview is implicated in such case. Nonetheless, in our discussion, *supra*, of the Fourth Amendment requirement that governmental intrusions be minimal, we noted that the brevity of the intrusion is an important factor in determining reasonableness of governmental action. It follows that, in a determination of whether an encounter is consensual, the brevity as well as the character of the encounter is significant inasmuch as a lengthy encounter is less likely to be voluntary. Once appellant responded to Detective Coleman's questions, without discovering reasonable articulable suspicion or probable cause during the interview, the volitional character of the subsequent interaction between appellant and the police is undermined, not only because it lasted much longer than the time required to ask appellant his name and date of birth, but because no further exchange or substantive communication transpired prior to receipt of the teletype report. The subsequent detention disassembles the argument that the encounter was consensual and constitutes an illegal arrest the legal consequence of which cannot be reversed by the later establishment of probable cause. As a result, the contraband recovered from appellant should have been suppressed.

Law enforcement officers frequently approach private citizens on public streets to enlist their aid in gathering evidence or obtaining information in solving crimes. When a citizen is approached as a potential witness or source of information in an attempt to solve a crime, there is a likelihood, if not a probability, that the citizen would be willing to listen and to render any assistance possible. A much different situation is presented, however, when the citizen is the target of the inquiry and a uniformed officer commences an on-the-street interrogation for the purpose of establishing that the person interviewed is committing or has committed a crime.[4] To be

---

4. In its most recent pronouncement regarding encounters between citizens and the police on a public street, the Supreme Court, in *Illinois v. Wardlow*, —— U.S. ——, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), rejected *per se* rule urged by respondent that flight by a person upon seeing a police officer can never, by itself, be sufficient to justify a

sure, not only is employment of aggressive police techniques not condemned, but such techniques are encouraged when employed within the parameters of prescribed constitutional boundaries and guidelines. We would be remiss if we failed to take cognizance of the fact that such confrontations are, by their very nature, adversarial. In no area of Fourth Amendment jurisprudence do aggressive police techniques collide more with constitutional guarantees than in the context of purportedly consensual encounters.

An accosting which becomes a consensual encounter between a citizen and the police is unique in Fourth Amendment law because such a confrontation is contingent upon the willingness of the citizen to cooperate, whereas other confrontations occur against the will and without the cooperation of the citizen. Because consent is the lynchpin of a consensual encounter, it cannot be artificially superimposed on circumstances under which no reasonable person would willingly consent or cooperate. As we have indicated, it is reasonable

---

temporary investigative *Terry* stop, while also rejecting petitioner's requested "bright line" rule authorizing the temporary detention of anyone who flees at the mere sight of a police officer. The Court, however, did reverse the Illinois Supreme Court which had concluded that the weapon seized from respondent should be suppressed because his flight was insufficient to constitute reasonable articulable suspicion, notwithstanding respondent's presence in a high crime area. Although the voluntary consent of the respondent was not an issue in *Wardlow*, the five–judge majority opinion, which determined that the totality of the circumstances was sufficient to justify the *Terry* stop and the four–judge concurring and dissenting opinion, pertinent to the discussion herein, reaffirmed the Court's decision in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) in which it held "that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Id.* at 498, 103 S.Ct. 1319. Any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." (Citing *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). More sufficient to our analysis herein is the Court's holding that, "[i]f the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his [or her] way." Also pertinent to our discussion is the Court's reaffirmation to a review of the "totality of the circumstances" in determining the reasonableness of the officers' conduct.

for one, who having been approached by an individual who identifies himself as a police officer and who perceives that his or her assistance is being sought to help solve a crime, to willingly cooperate. On the other hand, few citizens would stop at all if accosted by a stranger not in uniform and, as to persons who perceive themselves to be the possible subject of an investigation, virtually no one would submit to questioning absent the show of authority at least symbolically indicated by being accosted by uniformed police officers. To disregard the reality of the adversarial nature of a policeman's duties is to give judicial lip service to the spinal component of a consensual encounter, to wit: the voluntary consent of a reasonable person. We hasten to point out that there can be no bright line rule that voluntary consent can never be given by one suspected of committing a crime; however; the voluntariness of the target of a criminal inquiry should be subject to greater scrutiny than that of a citizen whose aid is enlisted in solving a crime in which the citizen has no involvement. The status of the citizen as the subject of the inquiry, in our view, is but one of the circumstances that must be taken into consideration in a determination of whether the encounter was voluntary.[5]

In conclusion, we pause to comment upon the underpinnings of the Fourth Amendment and the need, as it has been viewed

---

5. One of the relevant factors in assessing whether an encounter is coercive is "whether the police indicated that the person was suspected of a crime." *Ferris*, 355 Md. at 377, 735 A.2d 491. Decisions citing this factor (*United States v. McCarthur*, 6 F.3d 1270, 1275–76 (7th Cir.1993) and *United States v. Gray*, 883 F.2d 320, 322 (4th Cir.1989)), generally contemplate encounters when, unlike the circumstances in the case at hand, the police possess information that the person accosted is committing or has committed a crime. Although Detective Coleman possessed no such information, he certainly signaled to appellant that he suspected him of committing a crime as there was no purpose for the accosting other than to ascertain whether there were any outstanding warrants. Consequently, even though we have stated, *supra*, that no explicit indication that appellant was suspected of committing a crime was conveyed to him, the actions of the police officers left no doubt that he was suspected of committing some crime which had not been determined at the time of the accosting. The status of appellant as the subject of a criminal inquiry, in our view, should be accorded equal weight with the consideration that the detainee has been advised that he is suspected of a specific crime.

historically, to provide protection for the citizenry against arbitrary State action, commensurate with the reasonable exercise of Police Powers in advancement of the public interest. To be sure, the Fourth Amendment is not, nor ever was, intended to be a shield for lawbreakers or drug traffickers. As Supreme Court Justice Stevens, however, pointed out in a separate dissenting opinion in *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), citing the Annual Report of the Maryland Judiciary (1994–1995): "In Maryland alone, there are something on the order of one million traffic stops each year." *Wilson*, 519 U.S. at 418, 117 S.Ct. at 888, 137 L.Ed.2d at 50. Although the case at hand does not involve a traffic stop, the observations by Justice Stevens, in *Wilson*, dramatically point out the inherent dangers of indiscriminate unchecked "roundups" by law enforcement officers of innocent citizens. As Justice Kennedy observed in *Wilson*: "When *Whren* [*v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ] is coupled with today's holding, the Court puts tens of millions of passengers at risk of arbitrary control by the police." Similarly, the failure to provide appropriate judicial oversight in the discharge of police powers which impinge on constitutional safeguards in the area of on-the-street encounters puts untold numbers of pedestrians at risk of arbitrary control by the police.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.**